CLEVELAND-CLIFFS IRON CO. *v.* TOWNSHIP OF REPUBLIC.

TAXATION—ASSESSMENTS—"CASH VALUE"—SELLING PRICE—MINES. The determination by tax assessors in good faith of the cash value of a mine in accordance with a certain method and in connection with official data of the product and profits of the mine for a course of years preceding the assessment and the fact of a recent sale of the mine, will not be disturbed by the courts, although such determined cash value is greatly in excess of the amount realized on such sale.

Error to Marquette; Flannigan, J. Submitted January 8, 1917. (Docket No. 55.) Decided May 31, 1917.

Assumpsit by the Cleveland-Cliffs Iron Company against the township of Republic for taxes paid under protest. Judgment for defendant *non obstante veredicto*. Plaintiff brings error. Affirmed.

*William P. Belden,* for appellant.

*W. T. Potter,* for appellee.

The Republic mine, an iron mine, is in the township of Republic, in the county of Marquette. It is a considerable mine. The average annual shipment of ore therefrom, for five years preceding 1914, was 146,550 tons. The value of the mine for the purpose of taxation was estimated in the year 1914, as it had for several years theretofore been estimated, according to a report made by the company and a method known, perhaps, better than in any other way by the designation, the Finlay method. It is described in the opinion in *Newport Mining Co.* v. *City of Ironwood,* 185 Mich. 668 (152 N. W. 1088). In fixing valuations of mines for the year 1914, factors not those used by Mr. Fin-

Removed to Supreme Court of United States by writ of error June 30, 1917.

lay, more favorable than his were to the owners, were used by the board, and the recommendation of the board, in the case of the Republic mine, was adopted and approved by the local assessing officer. The method was uniformly employed by the board of State tax commissioners in valuing mines for taxation.

There is no evidence of any considerable difference of opinion prior to 1914 between the owners and the State tax officials concerning the value of the mine. On the contrary, there is evidence that the estimate of the owner and the estimate of the appraiser as to the ore in sight in different years were not greatly different, and as to the undeveloped and nonvisible ore the quantity estimated by the State officials was not seriously disputed. It is not intended to be said or to be inferred that the owners affirmatively approved the assessments, or the method of valuation employed. They did not protest, and it appears that a responsible officer of the owners was of opinion that the Republic mine was worth $1,000,000, or more. The taxing officials, at any rate the board of State tax commissioners, had data which included operator's reports for years 1909 to and including 1913, total shipments of ore, total profits, profits per ton, base value per ton, appraised value per ton, estimated ore reserves above bottom level, ore in stock. For the year 1913, the appraiser for the State and the tax officials accepted the operator's (Republic Iron Company) estimate of ore above bottom level, the appraiser added an estimate of ore below bottom levels of the ore bodies, and at a meeting of the board held at Marquette September 25, 1913, the valuation of the mine having been raised above the valuation for the previous year and fixed, including ore in stock, at $1,219,866, the superintendent of the mine, present at the meeting, said, "I think your valuation is fair." In 1914, in addition to all other data, there was before the officers the rec-

ord for the year 1913. There was no particular change made in the appraisement and valuation of the mine. Again, the appraiser and the taxing officers accepted the owner's estimate of ore in stock and ore in mine above bottom level. Again, there was added an estimate of ore "below bottom level." It is reasonably certain that if no sale of the property had been made, or if it had brought a higher price than it did at the sale which was made, questions now presented would not have arisen to vex counsel and the court.

After the owning company had, in March, 1914, made the annual report required of it, plaintiff, in May, 1914, purchased the mine and some other property from the Republic Iron Company for $600,000. Of its purchase and the price it had paid and the terms of the sale, it, on May 26, 1914, notified the board of State tax commissioners at a conference then held, and asked for a modification of the valuation of the property theretofore fixed by the board. The board declined to take action reducing the valuation; at least it did not reduce it, and local assessing officers finally valued the mine and stock pile at $1,115,-759. Plaintiff appeared before the township board of review, and filed a protest as follows:

"To the Board of Review of Republic Township, Marquette County, Michigan.
"The Cleveland-Cliffs Iron Company, a corporation organized under the laws of West Virginia and duly authorized to transact business within the State of Michigan, respectfully represents that it has purchased the Republic mine, stock pile and other property of the Republic Iron Company in your township, and hereby objects to and protests against the valuation which you have placed upon said Republic mine and stock pile for the following reasons:
"*First.* That the assessed valuation of $1,555,299 placed upon said Republic mine and stock pile for the year 1914 is grossly in excess of the true cash value of said property and more than twice its actual mar-

ket value when sold in the usual course of business and not at forced sale; that the undersigned has recently purchased from the Republic Iron Company said mine and stock pile, also the houses and other property owned by said company in the village of Republic, and approximately 5,000 acres of land, including its water power plant on Michigamme river, and also including timber lands of value, for a total consideration of $600,000, so that the purchase price of said mine and stock pile does not exceed the sum of $500,000.

"*Second.* That the true value of said mine and stock pile does not, in fact, exceed the amount so paid for it by the undersigned.

"*Third.* That it is a fundamental principle of taxation in Michigan, established both by statute and by court decisions, that the words, 'true cash value,' wherever used in the tax laws, shall be held to mean the market value of such property when sold in the usual course of business.

"*Fourth.* That the assessed valuation so placed upon the Republic mine and stock pile constitutes a discrimination against said property and against the undersigned, because it is not based upon the same rule and principle of taxation applied to other taxpayers and to other property in said township of Republic.

"The undersigned claims the benefit of the same rules and principles of taxation which are applied to other taxpayers in said township, and asserts that the valuation so placed upon said Republic mine and stock pile, if permitted to stand, will constitute a gross fraud upon its rights in the premises.

"The Cleveland-Cliffs Iron Company, therefore, requests this honorable board to reduce the valuation of said property to its true cash value as determined by its selling price in the market, which is the basis fixed by the laws of Michigan.

"The description of said Republic mine is as follows: That part of lot 1 and of the northeast quarter of northeast quarter not included in village plat of section 7, township 46, range 29. Southeast quarter of northeast quarter, section 7, township 46, range 29. Lots 2, 3, 4, 5, 6, and 8, section 7, township 46, range 29. East quarter of southeast quarter and

southwest quarter of southeast quarter section 7, township 46, range 29. North half of northeast quarter and lots 1, 2, 6, 7, and 8, section 18, township 46, range 29. Mineral rights on Republic Iron Company's additions to the village of Iron City.

"Dated this 6th day of June, 1914.

"The CLEVELAND-CLIFFS IRON CO.,

"By [Signed] M. M. DUNCAN, Agent."

No change in the assessed valuation was made, no appeal was made to the board of State tax commissioners, and the tax was paid under protest; this action being brought to recover the money, or a portion of it.

The lands plaintiff had purchased from the Republic Iron Company, aside from the mine, were assessed at $36,463.50, and no complaint is made of this valuation and the taxes levied upon it were paid without protest. The purchase price of the mine and this other property was $600,000, leaving the purchase price for the mine and stock pile, as plaintiff figures it, $563,536.50.

The Cambria Steel Company owned 99½ per cent. of the capital stock of the Republic Iron Company. In the sales agreement made between the Republic Iron Company and the plaintiff, subject to a necessary three-fifths vote of stockholders of the Republic Iron Company, the consideration named for the transfer of the Republic Iron Company property is $600,000, the purchaser to assume all liabilities incident to the operation of the mine from and after May 1, 1914. On the same day, an agreement was made between the plaintiff and the Cambria Steel Company which recites the making of the agreement between plaintiff and the Republic Iron Company, and that it was made at the special instance and request of the Cambria Steel Company, and that the Cambria Steel Company, in consideration of the execution of that contract and

its agreement to pay the purchase price therein named, agrees with the Cleveland-Cliffs Iron Company to guarantee the full and complete performance of the said contract on behalf of the Republic Iron Company that the purchase price of $600,000 shall be paid by the plaintiff—

"not in cash, but in the delivery of ore to the Cambria Steel Company as hereinafter provided, namely: By the sale and delivery to the Cambria Steel Company of three hundred thousand (300,000) tons of ore; one hundred thousand (100,000) tons of Lake Bessemer grade for 1914 delivery at this year's market price prevailing at Cleveland, Ohio; and one hundred thousand (100,000) tons per year for 1915 and 1916 deliveries, at the market price prevailing at Cleveland, Ohio, for said respective years. Said market prices for all of said years to be arrived at in the customary manner known to the trade at the opening of the sales market for each such year."

There is the further provision that when the deliveries of ore made by the Cleveland-Cliffs Iron Company shall exceed the sum of $600,000 in value at the prices fixed, the Cambria Steel Company will pay the balance of the purchase price of said ores to the Cleveland-Cliffs Iron Company in cash.

Other existing facts attending and influencing the sale of the Republic mine are stated by the trial judge in his opinion in this way:

"The Republic Iron Company is controlled by the Cambria Steel Company, a Pennsylvania corporation, which owns 99½ per cent. of the stock of the Republic company. The Cambria, which owns and operates various iron furnaces and mills, is classed among the very large iron and steel manufacturers of the United States. It does not appear that the Republic Iron Company owned, operated, or was interested in any iron furnaces or mills. The testimony warrants the inference, but furthermore it is common knowledge, that iron ores produced by different mines are rarely alike in all respects, and that the successful operation

of iron furnaces and mills, often requires that ores from different mines, or of different grade and characteristics, be intermixed before introduction in the furnace, and that an ore which cannot be used at all in the manufacture of certain kinds of iron or steel is usable, if not necessary to be used, in the manufacture of certain other forms of iron and steel. The iron ore requirements of the Cambria company average over 2,000,000 tons annually. The time came when it was not able to use the ores produced from the Republic mine, because they would not make, what the witness termed, a 'congenial mixture' in their furnaces. It does not appear the Cambria owned or controlled other iron properties, or, if it did that such properties supplied their wants. They were obliged to have recourse, therefore, for the necessities of their furnaces, to the open market. The Cleveland-Cliffs owns and operates a number of iron mines, from which it produces ores of various grades and characteristics, some of which, it may be surmised, from what transpired, serve to make a 'congenial mixture' in the Cambria furnaces. The Cambria being unable to smelt the same, advantageously, in its own furnaces, the product of the Republic mine was offered for sale through M. A. Hanna & Co., sales agents, of Cleveland, Ohio. M. A. Hanna & Co., were unable, it seems, to find among their customers, a market each year, for a tonnage equal to the capacity of the mine and, finding mining cost attending a restricted output unsatisfactory, they concluded to dispose of the property, and to that end opened negotiations with the plaintiff the Cleveland-Cliffs Iron Company. The result was that the Republic Company conveyed to the Cleveland-Cliffs the fee of the iron mine, certain other lands, the mine equipment, and personal property, for the consideration, expressed in the writings, of $600,-000, to be paid, however, by the delivery by the Cleveland-Cliffs to the Cambria of 100,000 tons of iron ore in 1914, 100,000 tons in 1915, and 100,000 tons in 1916, at the prevailing market price for the same, at Cleveland, Ohio, for the year in which the ore was delivered. It was further stipulated that in such deliveries, no ore from the Republic or from the plaintiff's mine known as the 'Cliffs Shaft,' would be included, and that deliveries for 1915 and 1916 should, at the option

of the Cambria, be either of the 'Standard Lake grade' which was an ore produced from its mines by the Cleveland-Cliffs, or out of the latter company's standard nonbessemer grades to be selected by the Cambria."

At the trial, the plaintiff and defendant each moved for a directed verdict in its favor. The court reserved decision, and the parties were sent to the jury upon the question of the value of the property, it being stipulated that plaintiff would be entitled to recover, in case the verdict was in its favor, $6,595.37; the question submitted to the jury by the court being whether the mine was put upon the assessment roll by the taxing officers at its true cash value. The jury was instructed that if it was, plaintiff could not recover; if it was assessed beyond its true cash value the plaintiff could recover such amount of its taxes as the jury should say were paid upon the excessive valuation. The jury was advised, too, that if they found the true cash value to be the amount of the purchase price, the verdict should be for the plaintiff. The jury returned a verdict for the plaintiff. Thereafter, June 12, 1916, the court granted the motion of defendant to direct a verdict in its favor, and on July 21st judgment was entered for the defendant.

Appellant in the brief states the questions involved to be:

"(1) That the failure and refusal of the board of State tax commissioners to assess the Republic mine and stock pile at the amount for which the property was sold in the open market to the plaintiff company, and its action on the contrary in assessing said property at approximately twice its said sale value, operated as a gross legal fraud against the rights of the plaintiff.

"(2) That the refusal of said board to give any consideration to said sale, although recognizing and accepting the evidence thereof as correct and sufficient, constituted a violation of their duties under the Michi-

gan tax laws, and operated as a fraud upon the plaintiff company.

"(3) That by reason of such discrimination against it, plaintiff has been compelled to pay more than its equitable share of the taxes of said township, and has been denied the equal protection of the laws of Michigan in violation of article 5, § 8, of the Constitution of the United States, and also of the Fourteenth amendment thereto."

The contention of the appellant, as it is stated, and the premises upon which the contention is founded, are:

"The question involved in this case is a simple one. The Republic mine property was sold in the usual course of business for what the parties to the transaction considered its full value, at or about the time when assessments are made. Evidence of this sale was placed before the commission, but they refused to give it any consideration, not because they were unconvinced as to the facts submitted, but for the reason that the commission concluded it was better to disregard the sale price entirely and continue to apply the so-called Finlay method of valuation, which they had theretofore been using in the absence of evidence of sale price. As a result, they assessed the Republic property for an amount approximately double that paid by the plaintiff. The question, therefore, for this court to determine is whether this action can be sustained under the statute which prescribes that real property should be assessed at its true cash value, which is defined as the usual selling price obtained at private sale. The general principle which we urged both before the board of State tax commissioners and at the trial and which, it seems to us, must be controlling, is that the evidence which was submitted to the board concerning the sale of the Republic mine established a fair presumption as to the true cash value of the property, that this presumption was not refuted by the presentation of any other facts or inferences, and that therefore it was binding upon the assessing officers as their standard of valuation."

In argument, in amplification of this contention, it is said, after referring to the decision of this court in *Newport Mining Co.* v. *City of Ironwood:*

"It is perfectly clear that the court in that case did not intend to 'change or modify' this 'cardinal rule of taxation.' Upon the record before them there was no evidence of selling value, nor any other method suggested of ascertaining value for sale purposes, than that presented by the Finlay method, therefore they applied it. That decision undoubtedly authorizes the use by the commission of the Finlay method as a supplemental or additional means of ascertaining selling value, when no market transactions are available to show the usual selling price in the ordinary course of business. The case does not, however, contain the slightest suggestion that the tax commission would be authorized, when evidence of the selling value in the usual course of business is available, to reject such data and substitute therefor the Finlay or any other method of value. The case at bar differs from the *Newport Case.* Here, we have undisputed evidence of a recent sale of the property, in fact a sale made within less than a month of the time when the valuation was to be placed upon the property. Even though it may be exceptional for a large iron mine to be sold, when it does happen, and the data is actually available, section 27 makes it improper to use some other standard of value. The commission cannot arbitrarily disregard such sale and continue to follow the method of valuation which it has adopted for use in the absence of such data. The controversy in this case arose absolutely and entirely from the unwillingness of the board of State tax commissioners to follow the standard prescribed by the statute. The board erroneously assumed that, because the Finlay method of assessing mining properties had been, as they thought, quite generally regarded as satisfactory, it would not be 'right' for them 'to depart from that method in any one instance' and make a valuation on a different basis. By reason of their holding this erroneous and incorrect view of their legal duty under the circumstances, the commission decided and announced that 'it was not called upon to take any action because of

the change of ownership of the Republic mine.' In pursuance of this opinion the commission entirely disregarded the sale of this property to the plaintiff, and assessed it according to the Finlay method. In other words, the tax commission erroneously interpreted the *Newport Case* as authorizing the complete substitution of the Finlay method for the statutory rule, so far as the assessment of mining properties is concerned. This action on their part was illegal, and operated as a legal fraud upon the rights of the plaintiff."

And again:

"While the assessing officers are undoubtedly given wide discretion in determining what is the usual selling price obtained at private sale, when that fact is determined it becomes absolutely binding upon the assessing officers. They are not permitted to ignore the standard fixed by the law and set up some other or different criterion of value. Otherwise, there could be no equality in taxation."

OSTRANDER, J. (*after stating the facts*). The purpose of the law in requiring all assessments to be on property at its cash value is to provide a standard for determining an equality of assessments. The legislature has said that the words cash value, in this connection, shall be held to mean—

"the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained therefor at private sale, and not at forced or auction sale." 1 Comp. Laws § 3850 (1 Comp. Laws 1915, § 4021).

This section of the statute does not stop here, but continues as follows:

"In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, quantity and value of standing timber, water power and privileges, mines, minerals, quarries or other valuable deposits known to be available therein and their value."

"The usual selling price" at the place where the property is when assessed is manifestly no guide to an assessor in a case where the property is singular in character and is never sold, or sold once in a decade. "Private sale" is contrasted with "forced or auction sale," and under proper conditions affords a guide to the assessor with respect to property which is commonly sold at private sale and also at forced and auction sales. Land, used for farming purposes and for residence purposes, valuable alone for cultivation or for residence, or both, is frequently sold, both at private sale and at public auction. In a particular community, the cash value of land is determined, without very much trouble, by experience, by history. Location and quality of soil would be considered in fixing the cash value of a farm. Location would be considered in valuing a city lot, but the quality of the soil would usually be a negligible factor in determining its cash value. And, in particular cases, quantity and value of standing timber, and the value of mines and mineral deposits, must be considered. The legislative definition, or meaning, of "cash value" applies to personal as well as real estate. Most taxable commodities are bought and sold in an open market, where there are competitive sellers and bidders. There is usually, for most commodities, a market price. Suppose, however, there is not a market price, and suppose that the property to be valued, real or personal, has no usual selling price at private sale and has never been sold in a particular community at forced or auction sale. Suppose the article has never been and cannot, reasonably, be duplicated. In short, suppose that no one or more of the tests found in the legislative definition affords any aid whatever in ascertaining the cash value of the article listed. Does it therefore escape taxation? Or, suppose an owner of real or personal property is willing, and perhaps

anxious, to dispose of it for less than it costs, and less than it would cost to duplicate it, and does dispose of it at private sale. Any number of illustrations may be given in support of the idea that the legislative tests are not and cannot be the only ones, and are not and cannot be exclusive of others.

Appellant does not, of course, contend that a purported sale of property, as land, or a mine, must be accepted by the assessor as fixing the cash value of the property, but does contend that when it appears that the seller and buyer of a mine are acquainted with the property and with other generally similar properties, know the value of ores and, generally, at any rate, the cost of mining, when they negotiate upon even terms and in good faith agree upon a value to be paid and received, in cash, for the property, the true cash value for purposes of taxation is thereby fixed and the assessor must accept it. I think the argument, to some extent, is affected, unconsciously, by the idea that, in the particular case, the good-faith agreement of vendor and vendee has eliminated an estimated factor—the factor of the quantity of non-visible ore—employed by the assessor in considering the valuable deposits available, in the land, so that what was before problematical and uncertain has been reduced to at least relative certainty by the fixing of the price in the agreement to buy and sell. If this idea at all affects the argument, it should not do so because it is evident that the buyer and seller are no better informed about the quantity and quality of nonvisible ore in this mine now than they were before the sale was negotiated, and no better informed than the agents of the State who made the estimate of the quantity of nonvisible ore for the State.

The legislative statement of the meaning of cash value, which is really a statement of tests to be applied in determining cash value, is not exclusive or in-

clusive. The tax law must be read as a whole. The general purpose of the law is to subject property to a proportionate payment of public levies. The first step in giving this purpose effect is listing and valuing of property. The duty of the assessor is to value property at its cash value, following and guided by the statute tests, and it is also his duty to list and to value property if none of the statute tests are helpful. It is usually persuasive of the value of a particular piece of property when its owner after negotiations sells it at private sale at a particular price. The Cambria Steel Company is a large user of iron ore of some grades. The Cleveland-Cliffs Iron Company is a producer of ore. It appears to have taken over the operation of this mine. There is nothing to indicate bad faith, or that the transaction amounts to anything else than the sale of the fee of this mine (and some other property) for $600,000 cash.

On the other hand, such sales of mines are not common; are rarely made. There is no market for the fee of iron mines, and no usual selling price for them. There can be none, and it is likely that a dozen similar sales would afford no reliable data for the valuation of any unsold iron mine. On the other hand, too, by approved methods the State had determined the value of this mine to be more than $1,000,000, in which it was in agreement with the superintendent of the mine, a man of experience. In this it employed certain factors, and with all the rest the judgment of the assessing officers. The factors are quite as certain, as reasonable, now as they were before the sale was made. The result arrived at by the assessing officers, approved by experience, by the history of the mine, is questioned by nothing except the price for which the land was sold. The fact that the property had been sold was a fact to be considered by the assessing officers who were nevertheless, in view of all the facts, required

to determine, according to their best judgment, the cash value of the property. The assessors adopted no wrong principle for determining the cash value when they considered the factors approved as the Finlay method, the official data at hand, and the fact of the sale to plaintiff; it would be unfair to say that they did not consider the fact that the sale had been made as affecting cash value. They disregarded none of the statute facts. There is no evidence of fraudulent purpose.

The case for plaintiff is, I think, no better than this: The good faith, judgment, and conclusions of the assessing officers is opposed by the good faith, judgment, and conclusions of the vendor and vendee of the land, affected, in the case of the vendor and vendee, by private interest. But the duty, in this behalf, rests upon the assessing officers, and their discharge of it, in this case, cannot be interfered with by the court. The judgment is affirmed, with costs to appellee.

KUHN, C. J., and STONE, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. FELLOWS, J., did not sit.