ANTISDALE v CITY OF GALESBURG

Docket No. 68104. Argued April 3, 1984 (Calendar No. 5).—Decided
December 28, 1984. Released January 15, 1985.

William S. Antisdale and Marvin DeVrou, owners of a federally
subsidized apartment complex, petitioned the Michigan Tax
Tribunal, seeking review of assessment of the property by the
City of Galesburg. The petitioners contended that an income
approach should be used in determining the value of the
property, while the city argued that a market approach was
proper. A hearing officer found in favor of the petitioners,
holding that the respondent's valuation approach would destroy
the principle of uniformity of taxation and that financing terms
could not be considered in determining the property's true cash
value. The Tax Tribunal accepted the officer's findings of fact,
but rejected his conclusions, finding the respondent's appraisal
approach persuasive. The Court of Appeals, Cynar, P.J., and
D. F. Walsh, J. (Bronson, J., dissenting), affirmed (Docket No.
52198). The petitioners appeal.

In a unanimous opinion by Justice Brickley, the Supreme
Court held:

True cash value of real property may not be determined for
tax assessment purposes by referring to the selling prices of
comparable properties, where the selling price is determined by
adding the outstanding mortgage balance assumed by the pur-
chasers to consideration above the mortgage balance paid to the
seller and the mortgages carry terms well below market rates.

1. Three methods of valuation of real property for tax assess-
ment purposes have been accepted by the Tax Tribunal and the
courts: the cost-less-depreciation approach, the capitalization-of-
income approach, and the market approach. It is the duty of
the tribunal to select in each case the approach that provides
the most accurate valuation. Factual findings of the tribunal

REFERENCES FOR POINTS IN HEADNOTES
[1-5] 72 Am Jur 2d, State and Local Taxation §§ 754, 759.
[2] 72 Am Jur 2d, State and Local Taxation § 755.
[3] 72 Am Jur 2d, State and Local Taxation § 796.
[4] Sale price of real property as evidence in determining value for
tax assessment purposes. 89 ALR3d 1126.

are final where supported by competent and substantial evidence, and, absent fraud, review of tribunal decisions is limited to determining whether the tribunal made an error of law or adopted a wrong principle.

2. In the abstract, determination of true cash value of property by referring to the selling prices of comparable properties is acceptable. However, in this case, the sales of the comparable properties involved the buyer assuming a federally subsidized mortgage and also paying a certain amount of consideration to the seller. The selling price of the comparable properties was determined by adding the amount of the federally subsidized mortgage assumed by the purchaser of each property to the amount of consideration given to the seller. In accepting this method of valuing the subject property by the city, the Tax Tribunal adopted a wrong principle. In Michigan, the selling price of a particular piece of property is not conclusive as evidence of the value of that piece of property. The Legislature has commanded that property be assessed at its "usual selling price." However, the sales price of a piece of property, as a result of many factors personal to the parties or otherwise, might not be its "usual" price. The market approach to value has the capacity to cure this deficiency because evidence of the sales prices of a number of comparable properties, if sufficiently similar, supports the conclusion that factors extrinsic to the properties have not entered into the value placed on the properties by the parties. Nevertheless, if it can be shown that the sale price each of the comparable properties has been determined by a flawed method the result of the market approach to valuation, as in this case, will also be flawed.

3. The fatal flaw in respondent's analysis is in its claim that the outstanding mortgage balance of a mortgage bearing an interest rate well below market rates has a dollar for dollar relationship to the value of the property. The method tells nothing about the value of the mortgage, or of the property as a whole. Without federally subsidized mortgages such properties would be nearly worthless. They are typically constructed in areas where rents, if charged at market rates, would be beyond the financial capability of the local population to afford. Furthermore, the quality of construction in these properties is generally greater than usually seen in non-federally subsidized projects, thus increasing their cost, but adding little value which would command greater rents if the market could bear them. Even the most desirable structure, if placed in an undesirable location, may upon completion be worth much less than its cost to construct. Since property such as that involved in the

present case has little capacity to earn income, the availability of the tax benefits may be the only reason to purchase it. To the extent that tax benefits to a typical owner affect the "usual selling price" of property, they are properly included within the true cash value of the property. Such incorporeal items, although not taxable in and of themselves, can increase or decrease the value of real property and should be reflected in the assessment process. Depreciation tax shelter benefits associated with investment property ownership inherently affect market value, and market value should not be determined as though real property ownership lacked tax shelter features.

Reversed and remanded.

109 Mich App 627; 311 NW2d 432 (1981) reversed.

1. TAXATION — ASSESSMENT OF REAL PROPERTY — TRUE CASH VALUE.

True cash value of real property may not be determined for tax assessment purposes by referring to the selling prices of comparable properties where the selling price is determined by adding the outstanding mortgage balance assumed by the purchasers to consideration above the mortgage balance paid to the seller and the mortgages carry terms well below market rates (MCL 211.27[1], 211.721; MSA 7.27[1], 7.40).

2. TAXATION — ASSESSMENT OF REAL PROPERTY — TRUE CASH VALUE — TAX TRIBUNAL.

The Michigan Tax Tribunal, in determining the valuation of real property for tax assessment purposes, must select, in each case, the valuation approach that provides the most accurate valuation from among the cost-less-depreciation, capitalization-of-income, and market approaches (MCL 211.721; MSA 7.40).

3. TAXATION — ASSESSMENT OF REAL PROPERTY — TAX TRIBUNAL — REVIEW OF DECISIONS.

Factual findings of the Michigan Tax Tribunal in real property assessment cases are final where supported by competent and substantial evidence, and, absent fraud, review of tribunal decisions is limited to determining whether the tribunal made an error of law or adopted a wrong principle (Const 1963, art 6, § 28).

4. TAXATION — ASSESSMENT OF REAL PROPERTY — TRUE CASH VALUE.

The selling price of real property is not conclusive evidence of the value of the property; under the market approach to valuation, sales prices of comparable properties, if sufficiently similar, will support the conclusion that extrinsic factors have not influenced the value placed on the properties of the parties; however, where it is shown that the sales prices were determined

by a flawed method, the market approach valuation will also be flawed (MCL 211.27[1], 211.721; MSA 7.27[1], 7.40).

5. TAXATION — ASSESSMENT OF REAL PROPERTY — TRUE CASH VALUE — TAX SHELTERS.

Depreciation tax shelter benefits inherently affect market value, and to the extent that they affect the usual selling price, they are properly included in determining the true cash value of real property (MCL 211.27[1], 211.721; MSA 7.27[1], 7.40).

*Katz, Victor & Yolles, P.C.* (by *Norman D. Katz),* for the petitioners.

*Morris, Culver & Yokom, P.C.* (by *William H. Culver),* for the respondent.

BRICKLEY, J. This case concerns the *ad valorem* taxation of a federally subsidized apartment complex, a complex covered by a mortgage which, in effect, bears a 1% interest rate. We must decide the permissibility of determining the true cash value of the property under a variant of the market approach to valuation. This variant approach values the subject property by reference to the selling price of properties also subject to mortgages bearing interest rates well below the market rate. The selling price of the comparable properties is determined by adding the outstanding mortgage balance assumed by the purchasers, the low interest rate notwithstanding, to the consideration to the seller above the mortgage balance assumed. We hold that this approach is impermissible.

Petitioners are the owners of a federally subsidized apartment complex. A number of parcels, having different tax identification numbers, are involved. Together, these properties make up an 8.36 acre piece of property. An apartment complex sits on the land and consists of 120 one- and two-bedroom apartments built in four phases between 1973 and 1976. There are a total of fifteen build-

ings, which are surrounded by vacant farmland. The complex is located in the City of Galesburg, between the cities of Battle Creek and Kalamazoo.

The apartment buildings are wood frame, "garden" type structures with patios and balconies. The complex is generally well maintained, carefully landscaped, and in good condition. It is 100% occupied and there is a waiting list.

Each phase of construction was separately financed. The Farmers Home Administration (FmHA) loaned 95% of the funds needed for each phase.

The mortgages carry the following terms:

Phase 1  (1973):  $295,900 to be paid in 50 years at 7-3/4%;
Phase 2  (1974):  $425,600 to be paid in 50 years at 8-3/4%;
Phase 3  (1975):  $451,000 to be paid in 40 years at 8-1/8%;
Phase 4  (1976):  $464,000 to be paid in 40 years at 9%.

The stated interest rates, however, are never paid. Instead, the FmHA waives all amounts of interest in excess of 1%, except in certain circumstances.

The FmHA imposes a rent schedule on the owners. Rental payments are determined by taking 25% of the tenant's income or a basic fixed rent set by FmHA, whichever is greater. The fixed rate is well below the market rate for similar apartments. Also, evidence was received which showed that the interest rate was increased whenever a tenant paid 25% of income as rent and that amount was over the basic fixed rent. There was, therefore, no incentive for the owners to rent apartments to persons with high incomes. Other restrictions nearly guarantee that the project will be nonprofit.

In the present case, for the sake of simplicity, the parties have treated the four mortgages as one large mortgage. We will continue that practice. Over the life of the project, the interest rate has never been in excess of 1-1/2%.

We are concerned with the valuation of this property for tax years 1978 and 1979. As of the 1978 tax day (December 31, 1977), the "mortgage" had a principal balance of $1,553,467 and had 40 years of payments remaining at the rate of $3,956 per month ($47,472 per year). Of that amount, 1% constituted interest, with the remaining amount going to pay off the principal. As of the 1978 tax day, the payment schedule and interest rate remained the same, but the principal balance of the mortgage remaining at that date was $1,509,488.

The City of Galesburg assessor, using the cost of reproduction less depreciation method, assessed the subject property for 1978 as having an assessed valuation of $855,000 with a true cash value of $1,710,000. The assessed value for 1979 was $878,000, with a true cash value of $1,756,000.

Petitioners protested both assessments before the local board of review, but received no relief. Separate petitions for review by the Michigan Tax Tribunal were filed and later consolidated on motion of the petitioners. Respondent abandoned its assessor's valuation prior to trial and instead had an appraisal prepared.

Petitioners' appraisal, relying on a report of the Michigan Chapter of American Institute of Real Estate Appraisers, used an income approach to value the subject property. The cost approach was rejected because a

"Cost Approach to value without measuring the deficiencies of the property in the competitive market would not measure the True Cash Value. To properly measure the obsolescence would require a measurement of deficient income. The resulting value would thus be a reciprocal of the Income Approach."

The market approach to value was also rejected

for the reason that there was a "lack of sales of similar properties * * * around Kalamazoo." The appraisal found that a comparison with other apartments "would require adjustments for different rent and demand levels" and "building characteristics and financing."

In using an income approach to value, petitioners did not capitalize the existing government mandated rents. Instead, the appraisal used a market rent, expenses, and capitalization method. That is, the appraisal assumed the property had no rent schedule or government regulated operation. Under such an approach, the assessed valuation of the property was determined to be $553,000 for 1978 and $555,500 for 1979, with true cash values of $1,106,000 and $1,111,000, respectively.

Respondent's appraisal used the market approach. The income approach was rejected because the property was rent controlled. The use of market rents and expenses was rejected because

"[t]o try to assign an assumed or fictitious rental rate to the apartments, and an equally fictitious schedule of expenses, in order to arrive at a pseudo, or assumed, net income, as if the project were not subject to the FmHA restrictions, is not a realistic approach to valuing the subject—particularly when the market demonstrates how such properties should be valued."

Respondent's appraisal found that the primary value of the projects was its value as a tax shelter. Respondent found, consistent with the idea that the property value was a heavily leveraged tax shelter, that the value of the property was a function of the amount of the mortgage remaining, in essence, that the mortgage was being purchased. Respondent then set about determining the value of the subject property by comparing it

to the sale of other similar government regulated properties.

Six unrecorded sales of FmHA properties on land contract, the details of which are not disclosed by respondent's appraisal, show the average sale price as being 110% of the outstanding mortgage on each property. Sales of interests in three other FmHA and FHA properties show a range of price from 115% to 126% of the assumed mortgage balance. These percentage figures were arrived at by adding the outstanding mortgage balance of each property to the amount over the mortgage balance paid to the seller and, expressing that sum as a percentage of the mortgage balance. Respondent concluded, after applying this formula, that the value of the subject property was 112% of the outstanding mortgage on the subject property. This percentage resulted in a valuation for tax year 1978 of $870,000, with a true cash value of $1,740,000. The 1979 valuation was $845,500, with a true cash value of $1,691,000.

A hearing was held on November 26, 1979, before a Tax Tribunal hearing officer. The hearing officer held in favor of petitioners. His proposed judgment found that respondent's approach to valuation would destroy the principle of uniformity of taxation. Moreover, the officer found that the financing terms could not be considered in determining the true cash value of the property:

"There is a distinction to be made between a property itself and the financing terms under which the property is bought and sold. Respondent would have us believe that the 'usual sale price' can refer to 'FmHA projects.' The statute however contemplates the usual sale price of the property, not the financing which accommodates its purchase or sale. Thus, the usual sale price requirement refers to multi-unit apartment buildings in this

case, not buildings which happen to be financed with a government subsidy.

"Similarly, the usual sale price must be interpreted to mean that sale which is usual in the open market. If exceptions are carved out, as in the instant case, where only a minute segment of comparable properties have this particular financing arrangement, the 'usual sale' requirement would become so diluted as to render the term meaningless.

"To require the assessor to analyze the complex financing restrictions noted in the instant case would impose a burden far more onerous than contemplated by the statutory requirements of MCLA 211.27[; MSA 7.27]. The duty of the assessor is to assess primarily the property."

The Tax Tribunal accepted the hearing officer's factual findings, but rejected his conclusions. It found respondent's appraisal persuasive. The "abundance" of market information showed the true cash value of the subject property:

"This Tribunal has always recognized the existence of three sound approaches to value, those being the proper application of the 'cost approach,' 'income approach' and 'market data approach.'

"All three methods should be utilized when the necessary data is available as it is in the instant case.

"It appears to this Tribunal that it flies in the face of being the proper approach to value, 'the usual selling price,' when one uses an income approach that results in a value indication that only totals approximately 70% of the mortgage balance of subject.

"On the other hand, it also appears to this Tribunal that the 'usual selling price' cash value can be best obtained from the market and sales analysis when an abundance of such information was available, as it was in the instant case, and supported by the record.

"The Petitioner has failed to sustain the burden of proof in establishing the true cash value of subject property."

Petitioner appealed to the Court of Appeals, where the decision of the Tax Tribunal was affirmed. 109 Mich App 627; 311 NW2d 432 (1981). The Court found the decision of the tribunal was supported by the evidence. The Court concluded:

"We think it is equally obvious that where the chief value of a property in the marketplace is as a tax shelter and the price that a buyer is willing to pay at a private sale is determined by that aspect of the property (indeed, it appears that the market for such property is created by the tax shelter aspect of the property), it is correct to consider the value of the property as a tax shelter in determining the [true cash value] of the property. The Tax Tribunal decision was supported by competent, material, and substantial evidence, and there was no error of law or adoption of wrong principles." 109 Mich App 633-634.

Judge BRONSON dissented, 109 Mich App 634, on the ground that the majority decision violated the principle of uniform taxation. He felt that all financing terms should be disregarded when assessing property and posited the hypothetical situation of two identical, side-by-side houses being assessed a different value because one of the houses was subject to a low interest rate.

This Court granted petitioner's application for leave to appeal. 418 Mich 874 (1983).

I

Const 1963, art 9, § 3, provides:

"The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not,

after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments. The legislature may provide for alternative means of taxation of designated real and tangible personal property in lieu of general ad valorem taxation. Every tax other than the general ad valorem property tax shall be uniform upon the class or classes on which it operates."

The Legislature carried out the constitutional command to provide for the determination of true cash value by enacting MCL 211.27; MSA 7.27. MCL 211.27(1); MSA 7.27(1) provides:

"As used in this act, 'cash value' means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale. A sale or other disposition by the state or an agency or political subdivision of the state of land acquired for delinquent taxes or an appraisal made in connection with the sale or other disposition or the value attributed to the property of regulated public utilities by a governmental regulatory agency for rate-making purposes shall not be considered controlling evidence of true cash value for assessment purposes. In determining the value the assessor shall also consider the advantages and disadvantages of location; quality of soil; zoning; existing use; present economic income of structures, including farm structures; present economic income of land if the land is being farmed or otherwise put to income producing use; quantity and value of standing timber; water power and privileges; and mines, minerals, quarries, or other valuable deposits known to be available in the land and their value."

As is obvious from a reading of Const 1963, art 9, § 3, providing the method by which the true cash value of property is determined is a legislative function. Also obvious from a reading of MCL 211.27(1); MSA 7.27(1), is that in carrying out that constitutional command, the Legislature avoided

specific directions and, instead, provided for the determination of true cash value by way of broad phrasing and lists of situations to consider. As a result, it has fallen to the courts to approve or disapprove specific methods of determining true cash value, guided by those available expressions of legislative intent.

Generally, there presently are three methods of valuation which are acceptable to the Michigan Tax Tribunal and the courts. They are the cost-less-depreciation approach, the capitalization-of-income approach, and the market approach.[1] *Con-*

[1] The following descriptions of the three basic valuation techniques are taken from the Michigan State Tax Commission Assessor's Manual, which, under MCL 211.721; MSA 7.40, all government assessors are required to use:

*Market Approach*

"The market value of a given property is estimated by comparison with similar properties which have recently been sold or offered for sale in the open market. The principle of substitution is applied, i.e., when *property* is replaceable, typical buyers will not purchase it at a higher price than those paid for similar properties with comparable locations, characteristics, and future earning capabilities. Of all appraisal methods the market data approach is the most direct, the best understood, and the only one directly reflecting the balance of supply and demand for a whole property in actual market place trading." 1 State Tax Comm Assessor's Manual, Ch VI, pp 1-2.

*Cost Less Depreciation Approach*

"In reality the cost approach is another type of comparative or market data approach. The land is considered to be unimproved and valued by methods [stated elsewhere in the manual]. The reproduction cost or replacement cost of the improvements is developed by comparison with the cost of new improvements, based on current prices of labor and materials for construction of similar improvements.

\* \* \*

"For most structures, depreciation must be deducted from this estimate of cost new because an old or used property is usually less valuable than a similar new one. This loss in value (depreciation) may be divided into three categories which are often estimated separately: physical deterioration, functional obsolescence, and economic obsolescence." 1 State Tax Comm Assessor's Manual, Ch VI, p 4.

*Income Approach*

"The income approach is based on the premise that there is a relation between the income a property can earn and its value. A large number of commercial properties are purchased and leased to

*sumers Power Co v Big Prairie Twp,* 81 Mich App 120; 265 NW2d 182 (1978); *Wolverine Tower Associates v City of Ann Arbor,* 96 Mich App 780; 293 NW2d 669 (1980). It is the duty of the Tax Tribunal to select the approach which provides the most accurate valuation under the circumstances of the individual case. *Pantlind Hotel Co v State Tax Comm,* 3 Mich App 170; 141 NW2d 699 (1966), *aff'd* 380 Mich 390; 157 NW2d 293 (1968). Furthermore, court review of decisions of the Tax Tribunal, in the absence of fraud, is limited to determining whether the tribunal made an error of law or adopted a wrong principle; the factual findings of the tribunal are final, provided that they are supported by competent and substantial evidence. Const 1963, art 6, § 28; *Fisher-New Center Co v State Tax Comm (On Rehearing),* 381 Mich 713; 167 NW2d 263 (1969).

## II

The primary issue in this case is whether the Tax Tribunal adopted a wrong principle when it determined that the true cash value of a subsi-

tenants by the owner who does not get the advantages arising from his own occupancy of the property. Consequently, the future net income the property is capable of earning is the main benefit to the owner. For this reason the worth of the property to prospective purchasers is based largely upon its income. In addition to income earned annually during an ownership term, another important benefit is the net amount received from the sale of the property when ownership is terminated. The earning potential of the property at that time will directly affect its sale price. The net income earning capacity of the property now and at ownership termination is, therefore, an important gauge of its value. The income approach to value translates the estimated future income of a property into total present value by the use of various data and organized mathematical computations." 2 State Tax Comm Assessor's Manual, Ch X, p 1.

Of course, there are valid variations of each method. By listing and providing capsule descriptions of these three methods we do not intend to preclude the development or use of other valid methods to valuation.

dized apartment complex could be determined by the particular market approach suggested by respondent. As previously stated, respondent's version of the market approach to valuation, as is typical when using that method, determined the true cash value of the subject property by reference to the selling price of a number of comparable properties. Of course, in the abstract, that is a perfectly acceptable method. In the present case, however, the typical comparable transaction involved the buyer assuming the federally subsidized mortgage and also paying a certain amount of consideration to the seller. Respondent determined the selling price of the comparable properties by adding the amount of the federally subsidized mortgage assumed by the purchaser of each property to the amount of consideration given to the seller. We hold that in accepting this method of valuing the subject property the Tax Tribunal adopted a wrong principle.

The rule in Michigan, as in many other states, is that the selling price of a particular piece of property is not conclusive as evidence of the value of that piece of property. See *Fisher-New Center Co, supra; Cleveland-Cliffs Iron Co v Republic Twp,* 196 Mich 189; 163 NW 90 (1917). See, generally, Anno: *Sale price of real property as evidence in determining value for tax assessment purposes,* 89 ALR3d 1126. The Legislature has commanded that property be assessed at its "usual selling price." The most obvious deficiency in using the sales price of a piece of property as conclusive evidence of its value is that the ultimate sale price of the property, as a result of many factors, personal to the parties or otherwise, might not be its "usual" price. The market approach to value has the capacity to cure this deficiency because evidence of the sales prices of a number of comparable proper-

ties, if sufficiently similar, supports the conclusion that factors extrinsic to the properties have not entered into the value placed on the properties by the parties. Nevertheless, if it can be shown that the sale price of each of the comparable properties has been determined by a flawed method the result of the market approach to valuation will also be flawed.

Respondent presented to the Tax Tribunal evidence of the sales price of nine comparable properties. All were similar apartment complexes encumbered by low-interest mortgages (although one of the comparables was encumbered by a 7.5% mortgage) such as the mortgage covering the subject property. The mortgages were issued either by the FmHA or the FHA. The first three comparable properties were sold under the following terms:

1) $120,000 to the seller plus buyer's assumption of the $696,000 mortgage balance, for a total price of $816,000. (Purchase price equals 117% of mortgage balance.)

2) $76,000 to the seller plus buyer's assumption of the $511,000 mortgage balance, for a total price of $587,000. (Purchase price equals 115% of mortgage balance.)

3) $750,000 to the seller plus buyer's assumption of the $2,900,000 mortgage balance, for a total price of $3,650,000. (Purchase price equals 125.86% of mortgage balance. Mortgage interest rate was 7.5%.)

The remaining six comparable sales involved sales under land contracts, the terms of which were not disclosed either to the Tax Tribunal or to this Court. Respondent's figures regarding each sale were expressed in terms of a purchase of 98% of the owners' interest in each property:

4) Purchase price of $1,500,000, which includes

assumption of $1,400,000 mortgage balance. (Purchase price equals 107% of mortgage balance.)

5) Purchase price of $1,300,000, which includes assumption of $1,200,000 mortgage balance. (Purchase price equals 108% of mortgage balance.)

6) Purchase price of $1,070,000, which includes assumption of $1,000,000 mortgage balance. (Purchase price equals 107% of mortgage balance.)

7) Purchase price of $1,200,000, which includes assumption of $1,100,000 mortgage balance. (Purchase price equals 109% of mortgage balance.)

8) Purchase price of $765,000, which includes assumption of $700,000 mortgage balance. (Purchase price equals 109% of mortgage balance.)

9) Purchase price of $330,000, which includes assumption of $300,000 mortgage balance. (Purchase price equals 110% of mortgage balance.)

Extrapolating these six land contract purchases to a purchase of a 100% interest in each property, respondent concluded that the average purchase price was 110% of each property's mortgage balance. On the basis of all nine transactions, respondent concludes that the subject property has a value of 112% of its mortgage balance in any given year.[2]

The fatal flaw in respondent's analysis is in its

---

[2] As is obvious from a review of the sums involved in the various transactions, the comparable properties were not comparable as that term is usually used. Physically, the comparable properties are quite different from the subject property. The location, size, and age of the "comparable" properties vary widely. However, it is respondent's contention that size, location, age, and even condition are irrelevant when valuing federally subsidized property. According to respondent, these properties are purchased for their tax benefits, those benefits are a function of the outstanding mortgage balance, and, therefore, the only relevant attribute of the property is the mortgage balance outstanding at the time of purchase. By converting the purchase price of the "comparable" properties to a percentage of the mortgage balance on each property, respondent mathematically creates a "market" percentage which, according to respondent, may be used to value the subject property, thus avoiding the need to compare the subject property to physically similar properties.

claim that the outstanding mortgage balance of a mortgage bearing an interest rate well below market rates has a dollar for dollar relationship to the value of the property. We do not accept that claim. Assuming a mortgage bearing a 1% interest rate in the market of 1977, 1978, or even today, does not translate into the assumption of a liability, or a value to the seller, in the amount of principal which remains to be paid on that 1% mortgage. We find the analysis of the Tax Tribunal in *Meadowlanes Limited Dividend Housing Ass'n v City of Holland,* unpublished opinion, Docket No. 55933, decided January 6, 1984, instructive on that point:

"A mortgage is an intangible asset. Although some intangible assets are equivalent to their face values, many are not. The mortgage instrument in question was neither new, nor competitive as to its interest rate. All [the owners' appraiser] did was to apply a discount rate which was prevalent in the commercial paper marketplace, so as to reflect the amount of currency which could be commanded by such instrument as of the tax date.

"*If* such mortgage instrument had been dated as of the tax date, and *if* it had contained terms and interest rate which were then competitive with other similar commercial paper then selling at face value, then its face (or nominal) value would have been the same as its cash equivalence, and adjustment would have been unnecessary.

"We consider this to be no different than the following example: If a seller of real property were to accept gold coins as payment for the property, and if the coins had a face value of $10, but the value of the gold content of such coins was $100, the conclusion would be that the sale reflects a true cash value for the property of $100. However, in this example, we doubt the assessor would contest such a conclusion.

"The same would be true if foreign currency were the consideration for the sale, where the rate of exchange

for such currency varied from its face value (but the denominations of the currency were the same as for domestic currency).

"This explains why [the owner] testified that he did not consider that he and his partners paid $2.4 million for the property. They *promised* to pay a total of approximately $2.4 million (over time), but the length of time is so long, and the interest rate so low, that the promise, when made, was only worth $750,000. In other words, if, rather than taking this mortgage, the mortgagee had instead invested $750,000 as of the date of the mortgage execution, at the then prevailing interest rates, at the end of the mortgage term, it would have had approximately $2.4 million. Obviously, no private investor would have taken such a mortgage."

As an example, in the present case, the hypothetical purchaser of the subject property would have to assume, approximately, a mortgage with a principal balance of $1,500,000. That amount, however, is subject to an interest rate of only 1% and is payable over 40 years. Under the terms of the mortgage, monthly payments of $3,764 were necessary. Petitioners submitted evidence which showed that an investment of $433,232 at an interest rate of 10.25% would generate enough income to make those $3,764 payments. To say that the mortgage balance had a value of $1,500,000 when it could be entirely assumed by giving up the use of $433,232 is to give an entirely new and foreign meaning to the word value.[3] By failing to discount

---

[3] Furthermore, respondent's failure to completely disclose the terms of the six land contract transactions renders the information derived from those sales meaningless. It is possible that payments made under the land contract were used by the land contract vendor to pay off the mortgage. This arrangement is treated by respondent as the equivalent of an assumption. If the land contracts carried market interest rates, the stated prices in the contracts might properly be used as comparables for the purpose of the market approach to valuation. Without knowing the interest rates of contracts, however, no conclusions can be drawn. It is quite possible that the land contracts carried a blended interest rate, reflecting the non-market

the outstanding mortgage balance of the comparable properties to the actual cost to the investor the Tax Tribunal adopted a wrong principle.

It is obvious that respondent's market approach does nothing more than determine the amount of consideration to the seller over and above the assumption of the mortgage. In that regard, the method may be entirely valid. Since, as respondent claims, the value of these subsidized properties lies in the tax consequences of depreciating these properties, it would not be surprising that, to some extent, the value of such properties is a function of their leveraged nature. Thus, respondent may well be correct in its claim that, upon sale, petitioners would have received an amount equal to 12% of the mortgage balance outstanding in consideration above the assumption of the mortgage. Nevertheless, it has not been established that the method tells us anything about the value of the mortgage, or of the property as a whole.

The Tax Tribunal seemed startled at the possibility that the subject property might be worth less than 70% of the principal balance of its mortgage. Together, petitioners and the federal government spent $1,718,325, to build the complex on the subject property. Using the cost of reproduction less depreciation method, respondent's assessor valued the property at over $1,700,000. Nevertheless, if the market method to valuation is used, and the non-market mortgage is discounted,

mortgage interest rate and a market rate for the amount attributable to the premium above the outstanding mortgage balance. It is also possible that the land contracts simply carried the interest rate of the non-market mortgages and that the premiums above the outstanding mortgage balances were paid to the land contract vendors as down payments. In these latter two cases, the land contract transactions would suffer from the same flaw found in the mortgage assumption transactions. In any event, since we do not know the terms of land contract transactions, we cannot assume that they accurately represent the value of comparable properties.

the property might reflect a value even less than half its cost immediately upon completion. Upon further analysis, however, such a result is not improbable.

Without the federally subsidized mortgage such properties would be nearly worthless. Evidence showed that such projects are typically constructed in areas where rents, if at market rates, would be beyond the financial capability of the local population to afford. Furthermore, evidence was introduced which showed that the quality of construction in such projects was greater than usually seen in non-federally subsidized projects, thus increasing their cost, but adding little value which would command greater rents if the market could bear them. As stated in *Meadowlanes Limited Dividend Housing Ass'n, supra*:

"Without the federal subsidy, neither [the owner] nor any other prudent investor could have been induced to invest in the project. The cost to build these units would require rental income far in excess of what could be obtained in the marketplace (and still generate sufficient profit so as to be economically viable). In fact, without the subsidy, debt service would be so high, there would be substantial negative cash flow which could reduce the tax shelter benefit to a point where the shelter was no longer an incentive to purchase."

Even the most desirable structure, if, for example, placed in an undesirable location, may be immediately worth much less than its cost to construct. Other factors can lead to the same result.

That is not to say that these subsidized properties, nearly guaranteed by federal rent ceilings to generate no income, have no value. The market approach, when properly used, demonstrates that there is a value to these properties, although considerably less than their cost to construct.

The foremost value of these properties is found in the tax benefits they generate to the owner. See, generally, *Kentwood Apartments v City of Kentwood,* 1 MTTR 295 (1977). Indeed, since property such as that involved in the present case has little capacity to earn income, the availability of the tax benefits may be the only reason to purchase such property. To the extent that tax benefits to a typical owner affect the "usual selling price" of property, they are properly included within the true cash value of the property. Tax benefits, like deed restrictions, *Helin v Grosse Pointe Twp,* 329 Mich 396; 45 NW2d 338 (1951), and zoning classifications, *Kensington Hills Development Co v Milford Twp,* 10 Mich App 368; 159 NW2d 330 (1968), of course, are not real property. Nevertheless, such incorporeal items, not taxable in and of themselves, can increase or decrease the value of real property, and that amount should be reflected in the assessment process. As stated in *In re Appeal of Johnstown Associates,* 494 Pa 433, 440; 431 A2d 932 (1981):

"Certainly, the tax status of the particular property owner is not a relevant inquiry under traditional circumstances; however, depreciation tax shelter benefits associated with investment property ownership inherently affect market value, and the court is not constrained to determine market value as though real property ownership lacked tax shelter features."

We express no opinion as to the actual value of the subject property in the present case or whether, on the particular facts, a market approach to valuation provides a measure of true cash better than other methods. Furthermore, we intimate no opinion as to whether the creation of a formula expressing the value of subsidized property as a function of its discounted outstanding

mortgage balance may substitute for traditional comparisons under the market approach. Although the existence of tax benefits may be considered in determining value, we express no opinion as to the effect of such benefits in the present case. Those are decisions initially for the Tax Tribunal, if raised in that forum. We merely hold that the Tax Tribunal adopted a wrong principle when it valued the subject property by reference to the outstanding balances on mortgages carrying terms well below market rates.

Reversed and remanded.

WILLIAMS, C.J., and KAVANAGH, LEVIN, RYAN, CAVANAGH, and BOYLE, JJ., concurred with BRICK-LEY, J.