576 N.W.2d 667 (1998)
227 Mich. App. 366
GREAT LAKES DIVISION OF NATIONAL STEEL CORPORATION, Petitioner-Appellant/Cross-Appellee,
v.
CITY OF ECORSE and City of River Rouge, Respondents-Appellees/Cross-Appellants, and
County of Wayne, Respondent-Appellee.
GREAT LAKES DIVISION OF NATIONAL STEEL CORPORATION, Petitioner-Appellee/Cross-Appellee,
v.
CITY OF ECORSE and City of River Rouge, Respondents-Appellees/Cross-Appellants, and
County of Wayne, Respondent-Appellant/Cross-Appellee.
Docket Nos. 197338, 200474.
Court of Appeals of Michigan.
Submitted November 13, 1997, at Detroit.
Decided January 20, 1998, at 9:00 a.m.
Released for Publication March 26, 1998.
*670 Honigman Miller Schwartz and Cohen by Jerome M. Salle and Michael B. Shapiro, Detroit, for Great Lakes Division of National Steel Corporation.
Mason, Steinhardt, Jacobs & Perlman, P.C. by Walter B. Mason, Jr., and Jonathan B. Frank, Southfield, for City of Ecorse.
Miller, Canfield, Paddock and Stone, P.L.C. by Robert F. Rhoades, Gilbert E. Gove, and Leland D. Barringer, Detroit, for City of River Rouge.
Jennifer M. Granholm, Corporation Counsel, and Richard G. Stanley, Assistant Corporation Counsel, for Wayne County.
Before BANDSTRA, P.J., and MARK J. CAVANAGH and MARKMAN, JJ. *668
*669 PER CURIAM.
Petitioner, Great Lakes Division of National Steel Corporation (GLD), appeals as of right and the respondents-cities, Ecorse and River Rouge, cross appeal in Docket No. 197338 from a judgment of the Michigan Tax Tribunal concerning industrial real and personal property tax assessments for tax years 1991, 1992, 1993, and 1994. During the pendency of this appeal, the case was remanded to the Tax Tribunal for a ruling on motions for rehearing. On remand, the Tax Tribunal *671 entered an order to partially grant reconsideration and modify the judgment. Respondent Wayne County filed an appeal as of right and the respondent-cities filed cross appeals in Docket No. 200474 from the order entered on remand. We partially vacate the judgment, as modified, and remand to the Tax Tribunal for further proceedings.

I. UNDERLYING FACTS AND PROCEEDINGS
Petitioner GLD is a production division of the National Steel Corporation located along the Detroit River in the cities of Ecorse and River Rouge in Wayne County. GLD is an integrated steel mill that produces flat-rolled steel from raw materials. Flat-rolled steel is used for various industries, such as automobile manufacturing and canning, but the product mix at GLD may vary in any particular month to meet customer requirements.
The land used for the principal steel-making operations at GLD is in two noncontiguous tracts, connected by a strip of land. The strip of land is adjacent to a railroad right of way that provides rail access between the tracts. The main plant is partially located in both Ecorse and River Rouge, and the steel-making process utilizes the facilities in both cities. Coke oven facilities are located in River Rouge on Zug Island, which are connected to the main plant by the strip of land and bridges. Coke, a commodity that can be purchased on the market, is used to produce a liquid iron product, which is then put through an oxygen process at the Ecorse facilities in order to convert the iron to steel. After further refinement, the liquid steel is put through a continuous caster process in Ecorse. A continuous caster produces slabs by solidifying the liquid steel.
After the slabs are produced, they are transported to a hot strip mill in River Rouge, which reduces the thickness of the slabs down to a hot-rolled band or coil. At this point, the product may be returned to Ecorse for a cold finishing process, which will return some rigidity to the product so that it can be used in forming operations. The product may also go through an electrogalvanizing line wherein corrosion resistance is added to the product. Rather than subjecting the product to this additional processing, the product may also be shipped to customers or other divisions of the National Steel Corporation as hot bands.
In addition to steel-making facilities, GLD has a number of ancillary facilities, such as a boat club, on the subject property. In July of 1991, GLD filed petitions in the Tax Tribunal to challenge the assessments on the real and personal property of the ancillary and steel-making facilities for tax year 1991. GLD filed separate petitions for each city. Wayne County was named as a respondent on both petitions. The Tax Tribunal subsequently allowed amendments of the petitions to add tax years 1992, 1993, and 1994. All tax years in question preceded significant amendments made by 1994 P.A. 415 to the General Property Tax Act, M.C.L. § 211.1 et seq.; M.S.A. § 7.1 et seq., effective with the 1995 tax year.
The Tax Tribunal did not consolidate the Ecorse and River Rouge cases, but did order a simultaneous hearing. Proposed valuations for the integrated steel mill and ancillary property were disclosed by GLD, Ecorse, and River Rouge before the hearing by exchanging appraisals. Ecorse and River Rouge did not rely upon the valuations reflected by the property tax rolls for the tax years in question and instead proposed new valuations for the property located in their respective cities based on appraisals. Wayne County adopted the valuation disclosure of the cities in their respective cases. Some corrections or modifications were made to the valuation disclosures during the course of the hearing, as experts provided testimony concerning the various approaches considered in the appraisals in reaching their opinions regarding how the integrated steel mill and ancillary facilities should be valued for property tax purposes.
None of the parties ultimately relied on an income approach in arriving at an indicated value for the integrated steel mill. GLD's valuation gave weight to a comparable-sales or market approach. GLD valued the integrated steel mill as a whole, and then allocated that value between the cities for each tax year. The valuations of Ecorse and River Rouge gave weight to cost-less-depreciation *672 approaches for each tax year. Ecorse and River Rouge did not value the entire integrated steel mill, but instead arrived at valuations based on the appraisal of facilities located within their respective cities.
The Tax Tribunal issued a written opinion following the hearing, wherein it was determined that the ancillary facilities, such as the boat club, should be valued as stand-alone properties for each tax year. The Tax Tribunal's decision regarding the ancillary facilities is not challenged on appeal, with the exception of an issue concerning the level of assessment discussed in part VI of this opinion.
With regard to the integrated steel mill, the Tax Tribunal determined that a rationale existed for rejecting all proposed valuation methods, but that it could use GLD's proofs regarding comparable sales to develop a formula for measuring the value of the integrated steel mill as a whole. As modified in its order partially granting reconsideration, the Tax Tribunal's formula resulted in a true cash value of $483,078,750 for each tax year. The Tax Tribunal then allocated this value between the cities and to specific tax parcels within each city. The Tax Tribunal's allocation of the true cash value between the cities, excluding the ancillary properties, was as follows:

Tax Year Ecorse River Rouge Total
 1991 $259,220,050 $223,858,700 $483,078,750
 1992 $225,742,700 $257,336,050 $483,078,750
 1993 $142,025,160 $341,053,590 $483,078,750
 1994 $156,179,360 $326,899,390 $483,078,750

II. STANDARD OF REVIEW
On appeal, the parties raise a number of issues regarding the Tax Tribunal's overall valuation for the integrated steel mill, the allocation of that valuation between cities and specific tax parcels, the levels of assessment, and procedural matters. Our review of the Tax Tribunal's decision is limited by the Michigan Constitution, which provides:
In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation. [Const. 1963, art. 6, § 28.]
While this Court is bound by the Tax Tribunal's factual determinations and may properly consider only questions of law under this section, a Tax Tribunal decision that is not supported by competent, material, and substantial evidence on the whole record is an "error of law" within the meaning of Const. 1963, art. 6, § 28. Oldenburg v. Dryden Twp., 198 Mich.App. 696, 698, 499 N.W.2d 416 (1993); Kern v. Pontiac Twp., 93 Mich.App. 612, 620, 287 N.W.2d 603 (1979). Substantial evidence must be more than a scintilla of the evidence, although it may be substantially less than a preponderance of the evidence. Jones & Laughlin Steel Corp. v. City of Warren, 193 Mich.App. 348, 352-353, 483 N.W.2d 416 (1992). "Substantial" means evidence that a reasonable mind would accept as sufficient to support the conclusion. Kotmar, Ltd. v. Liquor Control Comm., 207 Mich.App. 687, 689, 525 N.W.2d 921 (1994).

III. THE TAX TRIBUNAL'S OVERALL DETERMINATION OF TRUE CASH VALUE
We shall first address the issues raised by the cities and Wayne County concerning whether the Tax Tribunal's formula for determining the true cash value for the integrated steel mill constituted the adoption of a wrong principle or an error of law because this is the most significant issue raised on appeal.

A. Valuation principles
The Tax Tribunal is under a duty to apply its expertise to the facts of a case in order to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances. Antisdale v. City of Galesburg, 420 Mich. 265, 277, 362 N.W.2d 632 (1984); Jones & Laughlin Steel Corp, supra at 353, 483 N.W.2d 416. True cash value is synonymous with fair market value. Id. The burden of proof is on the petitioner to establish true cash value. Id. However, proceedings before the Tax Tribunal are original and independent and are considered de novo pursuant to M.C.L. § 205.735(1); M.S.A. § 7.650(35)(1).
*673 The Tax Tribunal has a duty to make its own, independent determination of true cash value. Oldenburg, supra at 699, 499 N.W.2d 416; Teledyne Continental Motors v. Muskegon Twp., 163 Mich.App. 188, 193, 413 N.W.2d 700 (1987). The Tax Tribunal is not bound to accept the parties' theories of valuation. It may accept one theory and reject the other, it may reject both theories, or it may utilize a combination of both in arriving at its determination of true cash value. Jones & Laughlin Steel Corp, supra at 356, 483 N.W.2d 416.
The three most common approaches for determining true cash value are the capitalization-of-income approach, the sales-comparison or market approach, and the cost-less-depreciation approach. Id. at 353, 483 N.W.2d 416. However, variations of these approaches and entirely new methods may be useful if found to be accurate and reasonably related to fair market value. Meadowlanes Ltd. Dividend Housing Ass'n v. City of Holland, 437 Mich. 473, 485, 473 N.W.2d 636 (1991). Regardless of which approach is used, the value determined by the Tax Tribunal must be the usual price for which the property would sell. Id.; Samonek v. Norvell Twp., 208 Mich.App. 80, 84, 527 N.W.2d 24 (1994); Jones & Laughlin Steel Corp, supra at 353, 483 N.W.2d 416; see also M.C.L. § 211.27; M.S.A. § 7.27. The task of approving or disapproving specific valuation methods or approaches has fallen to the courts because the Legislature did not direct that specific methods be used. Meadowlanes Ltd. Dividend Housing Ass'n, supra at 484, 473 N.W.2d 636.

B. The Tax Tribunal's formula
An understanding of the Tax Tribunal's formula is necessary to determine if it applied a wrong principle or committed an error of law pursuant to these valuation principles. In this regard, the record reveals that the Tax Tribunal considered the evidence concerning the various approaches to valuation presented by the parties before concluding that a variation of the sales-comparison or market approach would provide the most accurate determination of value. The sales-comparison or market approach has been described as requiring an analysis of recent sales of similar properties, a comparison of the sales with the subject property, and adjustments to the sale prices of the comparable properties to reflect differences between the properties. Samonek, supra at 84-85, 527 N.W.2d 24. It has been described as the only approach that directly reflects the balance of supply and demand for property in marketplace trading. Jones & Laughlin Steel Corp., supra at 353, 483 N.W.2d 416. However, if the analysis of a comparable sale is flawed, the valuation for the subject property is also flawed. Antisdale, supra at 278-279, 362 N.W.2d 632.
The record also reveals that the Tax Tribunal's determination that a variation of the sales-comparison or market approach should be adopted started with a finding that the subject property had a market, albeit a limited one. Relying on Clark Equipment Co. v. Leoni Twp., 113 Mich.App. 778, 318 N.W.2d 586 (1982), the Tax Tribunal also noted the difficulty in dealing with such large industrial properties.[1] Next, while rejecting the approaches of GLD and the cities, the Tax Tribunal adopted two important aspects of GLD's proofs. The Tax Tribunal found that no new integrated steel mills will be built and that GLD's comparable sales reflected the market reality that buyers will look to existing facilities to determine market value. The Tax Tribunal stated:
The Tribunal finds that Petitioner's comparables, but not Petitioner's proposed adjustments of those sales, reflect what the market reality is: existing integrated steel facilities that have been or will be modified by the potential buyer. The buyer will analyze what is available in the market, as *674 market comparisons, review in terms of the feasibility what has to be done overall to the facility to bring the facility up to the standard needed to produce the specific product line contemplated, and measure competitive utility in terms of possible market value.
The Tax Tribunal also adopted principles regarding "gross capacity" from GLD's appraisal evidence that, along with "effective capacity," had been used by GLD's appraisers to make adjustments to sales comparisons used in the GLD market approach to valuation. However, the Tax Tribunal also indicated that it would subject its analysis to other considerations, namely, the relationship between capacity and the number of processes done and the risk/return on assets used for that production. The GLD appraisal stated, in part:
Crude Steel CapacityThe crude steel capacity adjustment is based on exponential factors relating size (capacity) and cost. It is generally recognized and accepted by cost estimators and appraisers that addition of incremental capacity does not bear a direct linear relationship with cost. Rather, cost and capacity generally relate nonlinearly or exponentially, as evidenced by studies performed by cost engineers. This method of cost estimating is described in many textbooks, an example of which is Cost and Optimization EngineeringSecond Edition, edited by Jelen & BlackMcGrew [sic] Hill Book Company. Thus, when cost and capacity are known for one facility and the capacity of a second facility is known, the cost of the second facility can be estimated by applying the appropriate exponent to the size relationship between the facilities, producing a non-linear cost relationship factor to apply to the known cost.
The basis for capacity comparisons between the comparable and the subject was effective steel capacity presented in the Paine Webber report World Steel Dynamics, authored by Peter Marcus. These capacities are expressed in metric tons.
The Tax Tribunal ultimately developed its own formula for measuring the true cash value of GLD, which it deemed similar to another market-driven formula that was referred to by the Tax Tribunal as a "gross income multiplier" principle:
The Tribunal, for the integrated steel mill, first divided the sale comparables market price, which reflects the number of processes applied such as annealing, tandem mills, pickle lines, and EGL that also reflect quality, by its production capacity in tons to determine a sale price/per ton ratio. This factor is a comprehensive unit of measurement of all factors of value. It incorporates the effects of age, condition, physical features, and the existing functional and external obsolescence. This determined unit of measurement, although not income, is used in the similar manner as gross income is used in a Gross Income Multiplier (GIM), which essentially provides overall consideration of the comparable's features, incorporating all factors without further need for adjustments of differences between the comparables used and the subject. A GIM is used to relate the income-producing characteristics of the properties to their individual value in the sales comparison approach. Instead of determining the sale price to the annual gross income at the time of the sale, the Tribunal determined the ratio of the sale price to the steel-making capacity....
This developed ratio is product neutral. The use of the gross capacity measurement rather than effective capacity is age and condition neutral, a newer machine would have more effective capacity than an older unmodified machine. The use of a sale price/ton unit of measurement also eliminates the need to make further adjustments for capacity differences.
The Tax Tribunal also stated that it performed a graphic analysis of the four steel mill comparable sales that GLD's appraisal determined were most comparable to GLD to verify the accuracy of the formula, but did not include the graphic analysis in its opinion. The four sales were the Weirton Steel Mill (Weirton) located in West Virginia, the Warren Consolidated Industries (WCI) facility located in Ohio, Geneva Steel located in Utah, and the Rouge Steel facility located in Michigan. However, the Tax Tribunal ultimately *675 used only two of the sales in its formula, namely, the 1984 sale of Weirton and the 1988 sale of WCI. The information considered by the Tax Tribunal from these two sales is summarized in the following table:

Description WCI Weirton TOTAL AVERAGE
Unadjusted sales $148,800,000 $386,269,000
prices per GLD
appraisals
Crude steel capacity $4,450,000 2,225,000
per year in metric
tons per GLD
appraisals 1,550,000 2,900,000
Sales price per ton $96 $133.20 $229.20 $114.60
[sales price divided
by capacity] [$96 + $133.20] [$229.20/2]

The Tax Tribunal then took the averages for WCI and Weirton and put them into an algebraic formula, which the Tax Tribunal concluded would represent its analysis of the "curvilinear" relationship between the ratio of sales price per ton and total production capacity. The underlying rationale of the Tax Tribunal's approach was that its "multiplier" (sales price per ton) would increase as (1) the risk of return on an investment by a buyer decreases, and (2) the investment in assets by the integrated steel mill increases so that the integrated steel mill can perform more in-house functions, have more product diversity, and add capacity. In other words, a buyer would be willing to pay more per ton of crude steel capacity for an integrated steel mill with more capacity and more in-house processes. The formula adopted by the Tax Tribunal, as modified on reconsideration for a finding that GLD's annual capacity in metric tons (for the flat-rolled product produced at GLD's hot-strip mill) was only 3,062,500 metric tons was:

$114.60 [average WCI/ Weirton sales price per ton] = 2,225,000 tons [average WCI/Weirton capacity]
--------------------------------------------------- ---------------------------------------------
 X [GLD sales price per ton] 3,062,500 tons [GLD capacity]
Stated otherwise:
 X = $114.60 × 1.3764 = $157.74 [GLD sales price per ton]

When $157.74 is multiplied by a metric tonnage capacity figure of 3,062,500 for GLD, the true cash value determined by the Tax Tribunal for each tax year is $483,078,750.

C. Ecorse's contentions concerning true cash value
Although Ecorse raises a number of arguments on appeal concerning the Tax Tribunal's formula and statements made by the Tax Tribunal in arriving at the overall true cash value, the dispositive argument that requires reversal is Ecorse's claim that the formula is incomplete. In this regard, we find that, even if one assumes that the Tax Tribunal's use of average data from two sales [WCI and Weirton] having significantly different capacities to project a sales price for GLD would be consistent with its finding of a "curvilinear" relationship, a principal problem with the Tax Tribunal's approach is that it does not account for all value-influencing factors that the Tax Tribunal itself intended that it include. This is so because the Tax Tribunal found that both capacity and the number of processes carried out by the integrated steel mill were value-influencing factors, but the formula adopted by the Tax Tribunal contains only an adjustment based on capacity. The formula accounts for the Tax Tribunal's finding that a buyer will pay more per metric ton if there is increased capacity. With regard to this point, we also note that it is reasonable to infer that there would be a corresponding investment by an integrated steel mill in assets necessary to produce an increased capacity. However, *676 the formula is not affected by differences in the number of processes carried out by GLD in-house, as compared to an "average" figure derived for WCI and Weirton. This can be seen by utilizing an assumption that the capacity of GLD was the same as the average of WCI and Weirton, or 2,225,000 metric tons a year. If this number is inserted into the Tax Tribunal's formula for GLD, the resultant "X" factor for GLD is the same as the average of WCI and Weirton, namely, a sales price of $114.60 a metric ton. Despite the Tax Tribunal's conclusion to the contrary, no effect is given to the fact that GLD carries out in-house functions not performed by WCI or Weirton, such as the operation of the coke oven. Similarly, no effect is given by the Tax Tribunal's formula to the fact that WCI and Weirton carry out functions not done at GLD.
Most telling with respect to this deficiency in the Tax Tribunal's approach is its analysis of how WCI compared to the sale of one of the steel mills, namely, Geneva Steel, which was ultimately excluded from the Tax Tribunal's formula. Despite the Tax Tribunal's finding that Geneva Steel had a higher capacity than WCI, the Tax Tribunal concluded that WCI's higher multiplier could be explained by WCI's use of more processes:
Geneva Steel sold for $54,100,000 and has a total production capacity of 2,260,000 tons annually. The Geneva Steel comparable's multiplier, based on its market sale price, reflecting the quality and the number of processes its steel goes through divided by its capacity tonnage is $23.94 per ton. This reflected Geneva's limited processes and investment. The Tribunal, in reviewing the Geneva Steel comparable, finds this closed down mill, on "hot-idle," did not have a continuous caster, pickling capacity, a Tandem mill, annealing capacity, or an EGL (coating line). It was a very limited mill before it was shut down, with basically no cold mill operation.

* * * * * *
Warren Consolidated Steel (WCI) sold for $148,800,000. Its overall capacity is 1,550,000 tons per year. WCI's cold mill processing does include pickling lines and tandem mills. Reflected in WCI's sale price was the fact that it does not have coke ovens, continuous casting capabilities, or temper mills. Although WCI does have hot-dip galvanizing and tern coat lines, they are inferior to GLD's electrogalvanizing lines (EGL). Based upon WCI's sale price and capacity, it sold for $96 per capacity ton. The WCI comparable's multiplier of $96 reflects a higher investment in assets than Geneva, permitting it to perform more processes. This allows WCI to be less dependent on outside suppliers than Geneva, more flexible than Geneva to the market conditions, and more diverse in its product line. [Emphasis added.]
In sum, while recognizing that additional processes are a value-influencing factor, the Tax Tribunal's formula gives no more weight to GLD's processes than those reflected by the average sales price per ton for WCI and Weirton. Hence, while the Tax Tribunal's formula may achieve a result that the Tax Tribunal believed was appropriate for GLD and was required by its analysis of the data (e.g., that there should be a higher "multiplier" for GLD than that applicable to WCI or Weirton), the formula was based on a wrong principle or error of law because it was derived from a theory that the "multiplier increases as the number of processes increase and production capacity increases" but the actual formula adopted by the Tax Tribunal contains no adjustment for differences in the number of processes.
In reaching this conclusion, we recognize that the determination of true cash value is not an exact science and that it often involves a reconciliation of various approaches. As noted in Meadowlanes Ltd Dividend Housing Ass'n, supra at 485-486, 473 N.W.2d 636, "values derived under the various approaches are correlated, reconciled, and weighed in order to reach a final estimate of value. The ultimate goal of the valuation process is a well-supported conclusion that reflects the study of all factors that influence the market value of the subject property." Further, the process of weighing evidence involves a considerable amount of judgment and reasonable approximation. Comstock Village Ltd. Dividend Housing *677 Ass'n v. Comstock Twp., 168 Mich.App. 755, 760, 425 N.W.2d 702 (1988).
We also recognize that, while all relevant circumstances that tend to affect property value should be considered in the valuation process, Meadowlanes Ltd. Dividend Housing Ass'n, supra, there is no rule of law that requires the Tax Tribunal to quantify every possible factor affecting value. See Southfield Western, Inc. v. Southfield, 146 Mich.App. 585, 590, 382 N.W.2d 187 (1985) (holding that the Tax Tribunal did not err in failing to deduct the going concern value of a hotel business on land that was valued under an income approach when the petitioner failed to meet its burden of proof to show that the deduction should be made and there was no rule of law requiring the deduction). The Tax Tribunal's overall duty is to determine the most accurate valuation under the individual circumstances of the case. Meadowlanes Ltd. Dividend Housing Ass'n, supra at 498, 473 N.W.2d 636.
However, in utilizing a comparative sales approach, under either the commonly recognized form or a variation thereof, it is not enough that the result achieved (e.g., that the subject property have a higher fair market value than the comparable properties) be reasonable. The approach used to quantify the amount of true cash value must itself be reasonable and also demonstrate a well-supported conclusion. Although appealing as a simple formula that achieves the goal of valuing GLD higher than the two comparables used in the formula, we conclude that the Tax Tribunal's decision does not demonstrate a reasonable, well-supported conclusion relative to how much value should be assigned to GLD. Indeed, while the Tax Tribunal's use of the comparables' unadjusted sales price was intended to avoid the difficulty of having to quantify differences between GLD and the comparable sales properties, we note that the small number of comparables used in the formula should heighten, rather than reduce or eliminate, the need to analyze differences, including, but not limited to, an analysis of nonsteel-making assets in the sales prices.[2]
It may very well be determined that a capacity-based analysis will be useful in determining the most accurate means for computing true cash value under the circumstances of this case. However, it constituted a wrong principle or error of law for the Tax Tribunal, after finding that the number of processes was a value-influencing factor that should be accounted for, to fail to account for this factor in its formula. For this reason, we agree with Ecorse's argument that the case should be remanded for a new opinion with regard to true cash value.
Turning to the other contentions raised by Ecorse relative to the overall true cash value, we do not agree that the Tax Tribunal statements concerning "multiplier" principles require reversal. We reiterate that the Tax Tribunal is under a duty to apply its expertise to the facts of a case and is not bound by either party's theories of valuation. Jones & Laughlin Steel Corp., supra. However, if the Tax Tribunal takes notice of facts pertaining to a material, disputed issue, it must follow the procedures in the Administrative Procedures Act (APA),[3] which apply to Tax Tribunal proceedings. See Vomvolakis v. Dep't of Treasury, 145 Mich.App. 238, 377 N.W.2d 309 (1985). Under the APA, "[a]n agency may use its experience, technical competence and specialized knowledge in the evaluation of the evidence *678 presented to it." M.C.L. § 24.277; M.S.A. § 3.560(177).
In the case at bar, the Tax Tribunal took notice of appraisal principles on multipliers, including, in particular, a "gross income multiplier" technique that Ecorse acknowledges on appeal is a widely recognized valuation technique for income-producing properties. However, the Tax Tribunal then developed its own formula for determining true cash value based on an evaluation of the evidence presented at the hearing. Although Ecorse was not afforded an opportunity to dispute the Tax Tribunal's approach before its original opinion, Ecorse was afforded an opportunity to seek rehearing or reconsideration. Under these circumstances, while we have found that the Tax Tribunal adopted a wrong principle, we do not find that the Tax Tribunal's notice of multiplier principles requires reversal. See Kern, supra at 623, 287 N.W.2d 603 (error not grounds for reversal unless inconsistent with substantial justice); cf. Federal Armored Service, Inc. v. Public Service Comm., 204 Mich.App. 24, 28-29, 514 N.W.2d 178 (1994) (no procedural irregularity or prejudice found by judicial notice under M.C.L. § 24.277; M.S.A. § 3.560[177] where the record revealed no objection with respect to accuracy or materiality of information).
Similarly, we do not find that the Tax Tribunal's consideration of a graphic analysis requires reversal. The graphic analysis was not evidence, but merely reflected an analysis performed by the Tax Tribunal on evidence that was explained, but was not incorporated into the Tax Tribunal's written opinion. The purpose of the Tax Tribunal's opinion is to facilitate appellate review, but the Tax Tribunal Act and the APA require only a concise statement of facts and conclusions. See M.C.L. § 205.751; M.S.A. § 7.650(51), M.C.L. § 24.285; M.S.A. § 3.560(185); First City Corp. v. Lansing, 167 Mich.App. 248, 255, 421 N.W.2d 651 (1988). Although we do not find that the graphic analysis was necessary to review the Tax Tribunal's determination of true cash value, we note in passing that Ecorse itself had the opportunity to request the graphic analysis when moving for a rehearing, but did not do so.
Next, we have considered Ecorse's claim that the Tax Tribunal should have adopted its cost-less-depreciation approach to value as a more complete, accurate, and reliable indicator of true cash value for the Ecorse portion of the integrated steel mill. We conclude that Ecorse has failed to demonstrate that the Tax Tribunal's failure to follow the Ecorse approach constituted the adoption of a wrong principle or error of law for two reasons.
First, the cost-less-deprecation approach is in reality another type of comparative or market data approach. Antisdale, supra at 276, 362 N.W.2d 632. In the case at bar, the Tax Tribunal found that a potential buyer would look to existing facilities, but that no new integrated steel mill would be built in the future. On the basis of this finding, it can be inferred that potential buyers would not consider the cost to build as an alternative to buying an existing facility. If buyers and sellers do not use a technique, estimates of value derived therefrom have little bearing on the market price of the property. CAF Investment Co. v. Saginaw Twp., 410 Mich. 428, 476, 302 N.W.2d 164 (1981) (Levin, J., concurring). The only principle that would weigh against applying this result to the case at bar is the principle of a hypothetical buyer. Ecorse relies on two significant cases regarding the application of this principle. One case, Tatham v. Birmingham, 119 Mich.App. 583, 591, 326 N.W.2d 568 (1982), opines that the adjusted cost-of-reproduction-less-depreciation method is most suitable for industrial facilities for which no market, an inadequate market, or a distorted market exists. The other case, Clark Equipment Co., supra at 785, 318 N.W.2d 586, states that, to apply the usual selling price standard in M.C.L. § 211.27; M.S.A. § 7.27, a hypothetical buyer must be posited even though in actuality such a buyer may not exist. These cases establish that valuation can be determined strictly on a hypothetical basis, with the hypothetical buyer looking at the costs of building a new facility to determine the usual price of an existing facility even if a real buyer would not consider building such a facility. However, these cases do not stand *679 for the proposition that a hypothetical buyer must be presumed to have considered building an industrial facility as an alternative to purchasing an existing one when no such facility would be built and that hypothetical buyer has the ability to see what is occurring in the marketplace of existing facilities. To the contrary, adequate market data and obsolescence are exceptions to this rule. See Jones & Laughlin Steel Corp., supra at 354, 483 N.W.2d 416; Clark Equipment Co., supra at 784-785, 318 N.W.2d 586.
In the case at bar, there was no finding of obsolescence or, stated otherwise, no finding that GLD would not be sold as an integrated steel mill. There were, however, findings that no integrated steel mill would be built and that a limited market existed wherein integrated steel mills are rarely bought and sold. Whether the market data were adequate and would provide the more accurate determination of true cash value was a determination for the Tax Tribunal to decide in light of the evidence presented by the parties on cost and market approaches. Hence, while the Tax Tribunal's formula was flawed, it did not constitute an error of law or the adoption of a wrong principle for the Tax Tribunal to reject a cost-less-depreciation approach.
Second, even if a cost-less-depreciation approach were appropriate, the Tax Tribunal rejected Ecorse's particular approach on the basis that the approach determined a true cash value only for the portion of the integrated steel mill that was physically located in Ecorse. The weight to be accorded to the evidence is within the Tax Tribunal's discretion. Kern, supra at 622, 287 N.W.2d 603. It did not constitute an error of law or wrong principle for the Tax Tribunal to reject Ecorse's proposed valuation.
Next, we have considered Ecorse's contention that the conditions and circumstances of the WCI and Weirton sales were too unreliable for the Tax Tribunal to utilize in determining true cash value under a market approach. The principle of substitution underlying a market approach recognizes the fact that typical buyers will not purchase property at a higher price than those paid for similar properties with comparable locations, characteristics, and future earnings capabilities. Antisdale, supra at 276, n. 1, 362 N.W.2d 632. Although the sales price of a piece of property is not conclusive evidence of true cash value, even when the sale is for the property that is the subject of the assessment, this does not preclude a determination that the evidence concerning a sale has relevancy. See id. at 278, 362 N.W.2d 632; Jones & Laughlin Steel Corp., supra at 354, 483 N.W.2d 416. The ultimate goal of the Tax Tribunal is to determine the usual price for which property will sell. Antisdale, supra at 278, 362 N.W.2d 632. M.C.L. § 211.27(1); M.S.A. § 7.27(1) states:
As used in this act, "cash value" means the usual selling price at the place where the property to which the term applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale. The usual selling price may include sales at public auction held by a nongovernmental agency or person when those sales have been a common method of acquisition in the jurisdiction for the class of property being valued. The usual selling price does not include sales at public auction where the sale is part of a liquidation of a seller's assets in a bankruptcy proceeding or where the seller is unable to use common marketing techniques to obtain the usual selling price for the property.
We conclude that Ecorse's arguments regarding the conditions and circumstances of the WCI and Weirton sales only raise concerns regarding the weight that should be accorded to this evidence, and not the Tax Tribunal's ability to consider the evidence in determining the usual selling price of GLD's integrated steel mill. Kern, supra at 622, 287 N.W.2d 603; Jones & Laughlin Steel Corp., supra. With regard to the WCI sale specifically, we are not persuaded that the seller's bankrupt status precludes the Tax Tribunal from considering evidence of this sale. Cf. Samonek, supra at 86, 527 N.W.2d 24. Hence, we decline to hold that the Tax Tribunal will be precluded, as a matter of law, from utilizing the evidence *680 concerning WCI and Weirton in determining true cash value on remand.

D. River Rouge's contentions concerning true cash value
Like Ecorse, River Rouge raises a number of arguments concerning the Tax Tribunal's formula for determining the overall true cash value of the integrated steel mill. For reasons discussed above with regard to Ecorse, we agree with River Rouge's contention that the formula requires reversal because it was based on a wrong principle or an error of law.
With regard to River Rouge's other contentions, we find that River Rouge has not shown that the Tax Tribunal's rejection of both GLD's and River Rouge's approaches deprived it of procedural due process because a Tax Tribunal's ability to reject both parties' theories of valuation is a principle of law, Jones & Laughlin Steel Corp., supra at 356, 483 N.W.2d 416, and hence should not cause surprise. Further, the opportunity afforded to River Rouge to move for a rehearing and the record evidence that the Tax Tribunal considered the issues raised by River Rouge in its motion demonstrates that due process safeguards were satisfied. See Paschke v. Retool Industries (On Rehearing), 198 Mich.App. 702, 706, 499 N.W.2d 453 (1993), rev'd on other grounds 445 Mich. 502, 519 N.W.2d 441 (1994); see also Georgetown Place Cooperative v. City of Taylor, 226 Mich.App. 33, 52, 572 N.W.2d 232 (1997) (due process rights sufficiently protected by posthearing procedure conducted by Tax Tribunal).
We also reject River Rouge's contention that the Tax Tribunal should be precluded from considering a sales-comparison or market approach to value. Like Ecorse's argument, River Rouge's argument only raises concerns pertaining to the weight that should be accorded the evidence. This is particularly so with regard to River Rouge's challenge to the credibility of the testimony of a GLD appraiser, Anthony Wells, to argue that "competent" evidence was lacking. This Court will not assess witness credibility. Kotmar, Ltd., supra at 689, 525 N.W.2d 921. Further, we believe that River Rouge's argument confuses the concepts of "competency" and "substantial" evidence. An issue of "competency" would arise if the appraiser's qualifications to give expert testimony were challenged. However, if the appraiser is qualified, the question becomes whether there is "substantial" evidence, that is, a rational basis for the expert's views. Antrim Resources v. Public Service Comm., 179 Mich.App. 603, 620, 446 N.W.2d 515 (1989). In either case, the Tax Tribunal can still reject the appraiser's views as long as it does not substitute some other figure that is lacking in evidentiary support. Comstock Village Ltd. Dividend Housing Ass'n, supra at 760, 425 N.W.2d 702.
In the case at bar, River Rouge has characterized its claim as involving the competency of Wells' testimony, but has not challenged his expert qualifications or otherwise briefed the admissibility of his testimony under evidentiary rules applicable to the Tax Tribunal proceedings. The only authority cited by River Rouge in support of its argument is a Tax Tribunal rule identified as "MTTR 242," but there is no Rule 242. From the context of River Rouge's argument, it may have intended to rely on 1979 A.C., R. 205.1252(1). However, River Rouge has abandoned any issue concerning the admissibility of appraiser Wells' testimony under either 1979 A.C., R. 205.1252(1) or evidentiary rules by failing to brief the merits of this issue. See People v. Kent, 194 Mich.App. 206, 209-210, 486 N.W.2d 110 (1992).
We next consider River Rouge's argument that the rebuilt No. 5 coke oven located on the River Rouge part of the integrated steel mill should have been appraised as a stand-alone facility, rather than as part of the integrated steel mill. Fundamental to this argument is the concept of "highest and best use" considered in determining true cash value. This concept recognizes that the use to which a prospective buyer would put the property will influence the price that the buyer would be willing to pay for it. Rose Bldg. Co. v. Independence Twp., 436 Mich. 620, 633, 462 N.W.2d 325 (1990). In the case at bar, even River Rouge's appraiser agreed that the highest and best use of the subject *681 property was as an integrated steel mill. Because there was substantial, competent, and material evidence that the rebuilt No. 5 coke oven's highest and best use was as part of the integrated steel mill, the Tax Tribunal did not err in valuing this asset on that basis.[4]
We next address River Rouge's contention that the Tax Tribunal erred in failing to consider the option of dismissal for failure of any party to meet its burden of proof. The burden of proof encompasses two concepts: (1) the burden of persuasion, which does not shift during the course of the hearing, and (2) the burden of going forward with the evidence, which may shift to the opposing party. Jones & Laughlin Steel Corp., supra at 354-355, 483 N.W.2d 416. Provisions in the Tax Tribunal Act concerning the burden of proof and the de novo nature of the Tax Tribunal proceedings, M.C.L. § 205.735; M.S.A. § 7.650(35) and M.C.L. § 205.737; M.S.A. § 7.650(37), have been construed as imposing the burden on the petitioner to establish true cash value while, at the same time, imposing a duty on the Tax Tribunal to make an independent determination of true cash value.[5] See Jones & Laughlin Steel Corp., supra at 354-355, 483 N.W.2d 416; Alhi Development Co. v. Orion Twp., 110 Mich.App. 764, 314 N.W.2d 479 (1981). This Court has explained the rationale for prohibiting the Tax Tribunal from automatically accepting the respondent's assessment as follows:
Recognition of a conclusive presumption of validity as being applicable to an assessment appeal would preclude meaningful review of the assessment. A conclusive presumption of validity is diametrically opposed to the concept of an original, independent, de novo proceeding at which the petitioner simply bears the burden of proof.... The Tax Tribunal Act does not adopt a presumption of validity as a standard of review. Rather, the standard of review to be applied is whether in the proceeding before the Tax Tribunal, petitioner has proved, by the greater weight of evidence, that one or more of the assessments in question were too high based upon the Tax Tribunal's findings as to the true cash value. [Id. at 768, 314 N.W.2d 479.]
In the case at bar, GLD met its burden of going forward with evidence. River Rouge's arguments on appeal largely concern the reliability and weight of the evidence, a matter that the Tax Tribunal considered in its opinion while, at the same time, giving effect to the burden of proof placed upon GLD. River Rouge has not demonstrated that the Tax Tribunal incorrectly applied the burden of proof in arriving at its determination of true cash value. We conclude that the Tax Tribunal's failure to dismiss did not constitute an error of law.
River Rouge next argues that the Tax Tribunal erred in applying its own formula by not using a common unit of capacity to measure true cash value. We agree. Although the Tax Tribunal, on reconsideration, corrected its formula to state all capacity levels in metric tons, the evidence established that capacity levels can be based on what is "effective" (e.g., what is realistically expected of production on the basis of operating conditions and the capabilities of equipment) or "rated" (e.g., what is theoretically possible on the basis of the design of the facility). Capacity levels can also be reported for particular dates and at different stages of production.
We note that the Tax Tribunal expressed an intent in its original opinion to use "gross" (rated) rather than "effective" capacity so as *682 to render its formula "age and condition neutral" with regard to the machinery at the integrated steel mill. However, the formula ultimately adopted by the Tax Tribunal appears to use capacity levels at different stages of production and mixes "rated" and "effective" capacities. Indeed, GLD itself argues on appeal that the Tax Tribunal used the "effective" crude steel capacity for WCI and Weirton, but the "rated" capacity of the hot strip mill for GLD. The Tax Tribunal's adoption of an approach for comparing properties on the basis of different units of measurement further buttresses our conclusion that the Tax Tribunal's formula does not establish a reasonable, well-supported conclusion for true cash value. If the Tax Tribunal decides on remand that capacity information should be utilized in determining true cash value, we instruct it to utilize consistent units of measurement.
Like Ecorse, River Rouge argues that the Tax Tribunal adopted a wrong principle in rejecting the River Rouge appraisal for the River Rouge part of the integrated steel mill. River Rouge contends that it is not, and should not be, required to appraise the entire steel mill, but that it can properly value each taxable parcel separately.
It is a general rule that different parcels of land in the same ownership are to be regarded as separate units for tax purposes and, as such, must be separately valued and assessed. Rose Bldg Co., supra at 632, 462 N.W.2d 325. In certain circumstances, however, the general rule does not apply.
There are exceptions to and limitations upon the general rule of separate assessment of separate and distinct parcels of land. In the first place, statutes may expressly require, or be interpreted to require, the assessment as a whole of land in one ownership. Also, according to some cases, contiguous lots or tracts in one ownership may be assessed as a unit, although it is to be noted that the authorities are divided upon this point. The unit assessment of contiguous lands or lots has been permitted even though the unit of assessment has been subdivided by the owner. It has also been held that the question of what is a parcel of land within the meaning of the tax laws is to be determined rather from the situation, use, and occupation of the land than from technical description, and that where two or more tracts of land adjoin each other and are used and occupied as one tract, they may be taxed as a unit. It seems that where the parcels of land are so situated as to be incapable of separate valuation, a joint assessment will be upheld.
While property which should be assessed as a unit cannot be arbitrarily subdivided for assessment purposes by the taxing authorities, situations arise where the determination of whether there shall be a unit or separate assessment is regarded as within the discretion of the assessors. [72 Am. Jur. 2d, State and Local Taxation, § 744, pp. 72-73.]
Michigan's property tax law recognizes that contiguous property may be valued together in certain circumstances. See M.C.L. § 211.24(1); M.S.A. § 7.24(1) ("All contiguous subdivisions of any section that are owned by 1 person, firm, corporation, ... shall be assessed as 1 parcel, unless demand in writing is made by the owner or occupant of the section to have each lot assessed separately"); M.C.L. § 211.25(1)(e); M.S.A. § 7.25(1)(e) ("When 2 or more parcels of land adjoin and belong to the same owner or owners, they may be assessed by 1 valuation if permission is obtained from the owner or owners"). In any event, the task of approving or disapproving specific valuation methods or approaches has fallen on the courts because the Legislature has not directed that specific methods be used. Meadowlanes Ltd. Dividend Housing Ass'n, supra at 473, 473 N.W.2d 636. If a determination is made that the usual selling price for the integrated steel mill in its entirety (rather than by the placement of the boundary between the cities) is the most accurate method of determining true cash value, it follows that the Tax Tribunal does not adopt a wrong principle or commit an error of law in finding fault with an appraisal that omits consideration of the usual selling price.
There was overwhelming evidence that the highest and best use of the property was as *683 an integrated steel mill, and even the River Rouge witness, Russell Grander, who prepared the replacement model for the River Rouge appraisal, conceded that his replacement model would have had more efficiencies if an integrated steel mill had been developed. On this record, we do not find that the Tax Tribunal committed an error of law or adopted a wrong principle in finding fault with River Rouge's approach or in rejecting its cost-less-depreciation approach in arriving at true cash value.
Finally, we have considered River Rouge's claim that the Tax Tribunal erred in not considering more "compelling evidence" of value in its analysis, but do not find that River Rouge has shown either an error of law or wrong principle adopted by the Tax Tribunal. The matters raised by River Rouge primarily concern the weight to be accorded to the evidence and, hence, rested with the Tax Tribunal's discretion. Kern, supra at 622, 287 N.W.2d 603. Furthermore, with regard to the evidence concerning expenditures, we find that the Tax Tribunal correctly recognized the principle that expenditures for physical improvements do not necessarily add to a selling price dollar-for-dollar. First Federal Savings & Loan Ass'n v. Flint, 415 Mich. 702, 705, 329 N.W.2d 755 (1982).

E. Wayne County's contentions concerning true cash value
Wayne County essentially raises the same issues as the cities with respect to the Tax Tribunal's formula and the rejection of the cost-less-depreciation approach and, hence, these issues need not be separately addressed. We add only that Wayne County's interpretation of M.C.L. § 211.27(1); M.S.A. § 7.27(1) is too broad to the extent that it suggests that the Tax Tribunal may not consider evidence of any sale in bankruptcy in determining true cash value. M.C.L. § 211.27(1); M.S.A. § 7.27(1) excludes only sales at public auction where the sale is part of a liquidation of the seller's assets in a bankruptcy proceeding or where the seller is unable to use common marketing techniques to obtain the usual selling price for the property.
We also point out that M.C.L. § 211.27(1); M.S.A. § 7.27(1) is not itself an evidentiary rule. It defines "cash value." The statutes governing the types of evidence that the Tax Tribunal may consider are set forth in the APA and the Tax Tribunal Act, M.C.L. § 205.746; M.S.A. § 7.650(46). Vomvolakis, supra at 246, 377 N.W.2d 309. The Tax Tribunal Act provides that the Tax Tribunal may admit and give probative effect to evidence of a type commonly relied on by reasonably prudent men in the conduct of their affairs. M.C.L. § 205.746; M.S.A. § 7.650(46). Although we have concluded that the Tax Tribunal's novel approach for quantifying true cash value was based on an error of law or wrong principle, the Tax Tribunal's decision reflects that it did not use the "comparable" sale of either WCI in bankruptcy or Weirton as conclusive evidence of true cash value, but only held in light of the whole record that its approach would provide the most accurate valuation under the circumstances. We do not find that the Tax Tribunal's consideration of these sales in this manner was error.

IV. THE ALLOCATION OF THE OVERALL TRUE CASH VALUE BETWEEN CITIES AND TAX PARCELS AND THE DETERMINATION OF ASSESSED VALUE
All parties raise issues regarding whether the Tax Tribunal committed an error of law or adopted a wrong principle when allocating true cash value between the cities and to specific tax parcels within each city. Our decision to vacate the Tax Tribunal's overall determination of true cash value renders this issue moot because the Tax Tribunal's method of allocation may depend on or could be derived from the specific approach taken in arriving at the determination of true cash value. However, we will consider the parties' arguments because they may arise again on remand.
For purposes of our review of these issues, we must assume that the Tax Tribunal accurately determined that true cash value should be an identical amount of $483,078,750 for each tax year. We must also assume that this amount includes all of the real and personal *684 property of GLD's integrated steel mill, regardless of the tax status of particular assets, because it was the intent of the Tax Tribunal that true cash value could be determined without an analysis of the specific assets. Once that true cash value was determined, the Tax Tribunal used evidence of the current assessed values on the property tax rolls for tax years 1991, 1992, 1993, and 1994 to allocate the $483,078,750 between the cities and to specific tax parcels within each city.
Assessed value under the General Property Tax Act is a percentage of true cash value. Under M.C.L. § 211.27a; M.S.A. § 7.27(1), except as otherwise provided, property is to be assessed at fifty percent of true cash value pursuant to Const. 1963, art. 9, § 3. On its face, the Tax Tribunal's use of the current assessed values for allocating its overall true cash value appears to serve the goal of assigning fair market value to assets according to the same proportion as the current assessed values reflected in the property tax assessment rolls. If the current assessed values were all determinable on a consistent basis (e.g., a percentage of fair market value) and reflected all assets covered by the Tax Tribunal's overall determination of true cash value, we would not have difficulty in upholding the Tax Tribunal's approach. There are, however, special rules for certain assets within the integrated steel mill that affect the tax status or taxable amount of the assets. We hold, for reasons that will be discussed, that the Tax Tribunal adopted a wrong principle by using the current assessed values for the allocation without first determining how the current assessed values were affected by these special rules. We also find that the Tax Tribunal erred to the extent that its opinion can be construed as requiring assessed values to be computed in contravention of special rules applicable to certain assets.

A. GLD's contentions concerning the allocation of true cash value
GLD raises two arguments regarding the Tax Tribunal's allocation of true cash value. GLD characterizes its first argument as a claim that the Tax Tribunal erred in including the value of tax-exempt air pollution abatement equipment in GLD's integrated steel mill in its calculated true cash value. However, because the Tax Tribunal's overall approach for determining true cash value was intended to include all assets, we treat GLD's claim, in substance, as merely presenting an issue concerning how much of the overall true cash value of $483,078,750 should be allocated to pollution abatement equipment for each city. Stated otherwise, the first determination must be how much fair market value should be allocated to pollution abatement equipment. Once that allocation is made, the next step would be to determine if the allocated amount is exempt and therefore not subject to the General Property Tax Act. See M.C.L. § 211.1; M.S.A. § 7.1 (all property, real and personal, not expressly exempted, shall be subject to taxation); Chauncey & Marion Deering McCormick Foundation v. Wawatam Twp. (After Remand), 196 Mich.App. 179, 182, 492 N.W.2d 751 (1992).
We note that the evidence was undisputed that GLD was entitled to exemptions under the water exemption act, M.C.L. § 323.354; M.S.A. § 7.793(54), and the air exemption act, M.C.L. § 336.4; M.S.A. § 7.793(4),[6] pursuant to certificates of exemptions issued by the State Tax Commission in both cities. However, the current assessed values of the tax parcels used by the Tax Tribunal for allocating true cash value between the cities and to specific tax parcels contained therein excluded the exempt pollution abatement equipment. Because no allocation was made for the true cash value of exempt pollution abatement equipment, we hold that the Tax Tribunal's allocation method was based on a wrong principle. As a consequence thereof, fair market value that should have been assigned to exempt equipment spilled over to the fair market value of other assets subject to the General Property Tax Act.
GLD's second argument also concerns the inclusion of value attributable to *685 exempt real and personal property in the Tax Tribunal's overall true cash value. Specifically, GLD argues that the Tax Tribunal should not have included the true cash value attributable to the No. 2 continuous caster located in Ecorse. Again, we treat the substance of this argument as presenting an issue concerning how much of the overall fair market value of $483,078,750 should be allocated to the No. 2 continuous caster. Once that allocation is made, the next step would be to determine the No. 2 continuous caster's tax status.
As with the pollution abatement equipment, the evidence established that an exemption certificate was issued for the No. 2 continuous caster. Therefore, the No. 2 continuous caster was exempt from the General Property Tax Act as a facility for which an industrial facilities exemption certificate was issued. See M.C.L. § 211.7k; M.S.A. § 7.7(4h). However, the No. 2 continuous caster was still subject to an industrial facility tax under 1974 P.A. 198, M.C.L. § 207.551 et seq.; M.S.A. § 7.800(1) et seq. Because the No. 2 continuous caster was a replacement facility, the industrial facilities tax (hereafter IFT) was computed as follows:
The amount of the industrial facility tax, in each year for a replacement facility, shall be determined by multiplying the total mills levied as ad valorem taxes for that year by all taxing units within which the facility is situated by the state equalized valuation of the real and personal property of the obsolete industrial property for the tax year immediately preceding the effective date of the industrial facilities exemption certificate after deducting the state equalized valuation of the land and of the inventory as specified in section 19. [M.C.L. § 207.564(1); M.S.A. § 7.800(14)(1).[7]]
We note that the current assessed values for the No. 2 continuous caster used by the Tax Tribunal for allocating its overall fair market value, $483,078,750, between cities and to tax parcels in its order granting partial reconsideration, was based on the "frozen" value of the obsolete, replaced industrial property required by M.C.L. § 207.564(1); M.S.A. § 7.800(14)(1). By contrast, those properties subject to the General Property Tax Act have assessed values determined on the basis of the true cash value (fair market value) of existing properties as provided for in M.C.L. § 211.27a; M.S.A. § 7.27(1). Because the assessed value of the No. 2 continuous caster is not based on the fair market value of the existing property, the Tax Tribunal's allocation approach lacks uniformity and consistency. Hence, we hold that the Tax Tribunal adopted a wrong principle in using the current assessed value of the real and personal property for the No. 2 continuous caster in its allocation.

B. Ecorse's contention concerning the allocation of true cash value
Ecorse contends that the Tax Tribunal committed an error of law or adopted a wrong principle by using current assessed values to allocate true cash value between cities because neither GLD nor Ecorse contended that the current assessed values were correct. We disagree. While we have found error in the Tax Tribunal's treatment of exempt properties, we conclude that the Tax Tribunal's overall approach was reasonable under the particular circumstances of this case, as long as the current assessed values were subject to a determination under a consistent approach (e.g., a percentage of fair market value) and exempt property was accounted for.
We believe that Ecorse's contrary argument incorrectly presumes that the allocation between cities should or could be made on the same basis as the underlying method used to determine true cash value. This is incorrect because the Tax Tribunal determined a single true cash value for the integrated steel mill using a capacity-based formula, and the allocation to segments of the integrated steel mill could not be based on this same principle. As was observed below by the Tax Tribunal itself:
A basic valuation principle is the sum of the parts may not equal the whole. In some cases, the sum of the parts may be *686 less than or greater than the whole. But in this case, it is essential that the sum of the parts do equal the whole. Logical appraisal practice concludes that to properly value property it only makes sense to cost the entire facility, not just half of it, especially if using the cost approach, which requires the analysis of a replacement facility. An appraiser cannot correctly and accurately determine the true cash value of a property by appraising only half of a facility that is "integrated" and without question dependent upon all interrelated functions. That would be analogous to valuing a car for resale based upon the individual parts. By selling a potential buyer the shell, based on its value, then separately selling the chassis, based on its value, and finally the engine and other components, a $20,000 car would be worth substantially more.
The Tax Tribunal is under a duty to apply its own expertise to the facts of a case to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances. Jones & Laughlin Steel Corp., supra at 353, 483 N.W.2d 416. Logic dictates that, if individual components cannot be, or as in this case are not, valued individually in determining an overall true cash value, then the allocation cannot be based on such a valuation. Under these circumstances, the Tax Tribunal's choice of another allocation approach was reasonable.
We do not agree with Ecorse's position that the Tax Tribunal's use of current assessed values penalizes Ecorse for the fact that the No. 5 coke oven in River Rouge was rebuilt and placed on River Rouge's assessment roll during the tax years in question. We believe that Ecorse's argument is primarily a function of the Tax Tribunal's finding that true cash value should be identical for each year, regardless of the facilities in operation for any particular tax year. Assuming for purposes of our review of this issue that the overall true cash value of $483,078,750 was accurate, the most one could say is that the Tax Tribunal's allocation method gives effect to the fact that investments were being made by GLD to modify and replace assets in certain segments of the integrated steel mill, while other assets continued to suffer from depreciation and obsolescence. Hence, properly viewed in light of our assumption regarding the accuracy of the overall true cash value, we are not persuaded that Ecorse has demonstrated that the allocation approach constituted an error of law or the adoption of a wrong principle.

C. River Rouge's contentions concerning the allocation of true cash value and assessed values
River Rouge argues that the Tax Tribunal's allocation method was flawed because GLD did not appeal an IFT assessment of the rebuilt No. 5 coke oven for tax year 1992. Because River Rouge gives only cursory consideration of this issue, with no citation of supporting authority or the record, we need not address this claim. See Community Nat'l Bank v. Michigan Basic Property Ins. Ass'n, 159 Mich.App. 510, 520-521, 407 N.W.2d 31 (1987). However, because this issue may arise again on remand, we will briefly consider it.
In this regard, we note that River Rouge is claiming that the Tax Tribunal should have allocated its overall true cash value of $483,078,750 for tax year 1992 between appealed tax parcels, and then added the value on the assessment roll for the rebuilt No. 5 coke oven to the River Rouge total. However, this claim has merit only if the rebuilt No. 5 coke oven was excluded from the overall true cash value. If the overall true cash value included the rebuilt No. 5 coke oven, then, logically, it must be accounted for in the allocation process. To hold otherwise would cause a spillover of this parcel's value to other tax parcels within the cities. To go one step further and add a value for the rebuilt No. 5 coke oven after this spillover, as is proposed by River Rouge, would result in a duplication of value for the rebuilt No. 5 coke oven.
In any event, once an allocation is made of the overall true cash value to the rebuilt No. 5 coke oven in River Rouge, the next step would be to determine if any special rules must be applied in determining the assessed value. In its order to partially grant reconsideration *687 during the remand proceedings ordered by this Court, we note that the Tax Tribunal specifically rejected River Rouge's position that the value of the rebuilt No. 5 coke oven should be added to its determined value for tax year 1992. For reasons discussed above, we are not persuaded that this constituted an error of law or was based on a wrong principle. However, because the Tax Tribunal did not make specific findings on the assessed values in its order to partially grant reconsideration and did not specifically determine the effect of GLD's failure to appeal on the amount of assessed value that should be allowed for tax year 1992, we instruct the Tax Tribunal to address this issue on remand.

D. Wayne County's contentions concerning the allocation of true cash value and assessed values
Wayne County raises several arguments concerning the Tax Tribunal's allocation approach and assessed values. With the exception of Wayne County's claims regarding the assessed values of certain IFT parcels, we find that Wayne County's arguments are duplicative of the cities' arguments on appeal, and we need not separately address these arguments.
Wayne County's first claim concerns the assessed value of the same No. 2 continuous caster in Ecorse, which was the subject of GLD's challenge to the Tax Tribunal's allocation of overall true cash value. The specific issue raised by Wayne County is whether the Tax Tribunal unlawfully required that the assessment for this IFT replacement facility be determined using the same method as non-IFT parcels. We find that the Tax Tribunal's order to grant partial reconsideration can be construed in this manner. We believe that the difficulty in construing the order stems from the Tax Tribunal's failure to make specific findings regarding the assessed values of the tax parcels after fixing the level of assessment and allocating the overall true cash value between cities and to the specific tax parcels within each city. M.C.L. § 205.737; M.S.A. § 7.650(37) required that the Tax Tribunal determine the lawful assessment.[8] Hence, we instruct the Tax Tribunal on remand to make specific findings regarding the assessed values of the tax parcels and, with regard to the No. 2 continuous caster specifically, to determine an assessed value that comports with the tax statutes for IFT parcels.
Wayne County's second claim concerns the IFT parcels for the electrogalvanizing line in Ecorse. Wayne County argues that these IFT parcels are subject to the same "replacement facility" exemption as the No. 2 continuous caster and, hence, should also have a "frozen" assessed value. Because Wayne County cites no factual support for this argument, we need not address it. A party may not leave it to this Court to search for a factual basis to sustain or reject its position. People v. Norman, 184 Mich.App. 255, 260, 457 N.W.2d 136 (1990). However, we instruct the Tax Tribunal on remand to determine assessed values for all tax parcels that conform with the applicable tax statutes.

V. RIVER ROUGE'S MISCELLANEOUS PROCEDURAL ISSUES
We have also considered three issues raised by River Rouge regarding pretrial proceedings, discovery, and the allowable cross-examination at the hearing. We find, however, that River Rouge has not established any basis for relief.
We decline to address River Rouge's claim that the Tax Tribunal erred in denying its requests for dismissal, or other rulings, relative to alleged misrepresentations made by GLD regarding its income because River Rouge's argument lacks citation of supporting authority. This Court will not search for authority to support a party's position. Samonek, supra at 86, 527 N.W.2d 24.
We similarly find that River Rouge's claim regarding discovery need not be addressed because it is given only cursory consideration, with no citation of any authority concerning the Tax Tribunal's prehearing and discovery procedures. Community Nat'l Bank, supra at 520-521, 407 N.W.2d 31. The only authority cited by River Rouge, Roe *688 v. Cherry-Burrell Corp., 28 Mich.App. 42, 184 N.W.2d 350 (1970), addressed a party's right to depose an opponent's expert under the civil court rules. We are not persuaded that River Rouge has shown any basis for relief stemming from the Tax Tribunal's prehearing and discovery proceedings.
River Rouge's contention that it was denied a right to cross-examine Ecorse's witnesses at the simultaneous hearing held with regard to GLD's petitions is also given only cursory consideration and, hence, need not be addressed. Community Nat'l Bank, supra at 520-521, 407 N.W.2d 31. In passing, we note that River Rouge failed to preserve a claim that it was denied a constitutional right to cross-examination by objecting on this ground at the hearing. See Town & Country Dodge, Inc. v. Dep't of Treasury, 420 Mich. 226, 228, n. 1, 362 N.W.2d 618 (1984). This Court may nevertheless address constitutional questions that were not addressed below where no question of fact exists and the interest of justice and judicial economy so dictate. Plymouth Twp. v. Wayne Co. Bd. of Comm'rs, 137 Mich.App. 738, 748, 359 N.W.2d 547 (1984). A party's right to cross-examine adverse witnesses is a basic due process right. Bonelli v. Volkswagen of America, Inc., 166 Mich.App. 483, 502, 421 N.W.2d 213 (1988); Cooper v. Chrysler Corp., 125 Mich.App. 811, 818, 336 N.W.2d 877 (1983). However, on the basis of our review of the record and River Rouge's cursory argument, we are not persuaded that the requisite adversity and prejudice exist for granting relief relative to this unpreserved constitutional issue.

VI. LEVEL OF ASSESSMENT
We next address GLD's claim concerning the Tax Tribunal's findings regarding the average levels of assessments for industrial real property in its order to partially grant reconsideration. Underlying this claim is the Tax Tribunal's obligation to determine the average level of assessment in relationship to true cash values in the assessment district pursuant to M.C.L. § 205.737; M.S.A. § 7.650(37), for which assessing agencies have the burden of proof.
The average level of assessment is determined by dividing the assessed value of all the taxable real property in an assessing district, exclusive of the assessed value placed on the petitioner's real property, by the true cash value of all taxable real property in the assessing district, exclusive of the true cash value of the petitioner's taxable real property. Cf. Ford Motor Co. v. State Tax Comm., 63 Mich.App. 577, 588, 234 N.W.2d 711 (1975). Although part of the system of equalization is designed to remedy the potential for unequal assessment levels, the average level of assessment serves a distinct purpose from county or state equalization by addressing unequal assessment levels within a class of property in a single taxing district. Shaughnesy v. Tax Tribunal, 420 Mich. 246, 249-250, 362 N.W.2d 219 (1984). The taxpayer may obtain relief only when it is shown that the property was assessed at a different proportion of true cash value than the rest of the property within the same class in the taxing district. Id. at 249, 362 N.W.2d 219; see Hoerner-Waldorf Corp. v. Village of Ontonagon, 26 Mich.App. 542, 182 N.W.2d 759 (1970).
In the case at bar, the proofs presented on the levels of assessment focused on the county's equalization process for each tax year. Intracounty equalization requires that the county determine whether taxing units within the county have equally and uniformly assessed property at fifty percent of true cash value. Fairplains Twp. v. Montcalm Co. Bd. of Comm'rs, 214 Mich.App. 365, 369, 542 N.W.2d 897 (1995). However, the equalization process is not an exact science. It may be based on an appraisal equalization study using sampling techniques to arrive at an assessment-appraisal ratio expressed as a percentage. Id. at 369-370, 542 N.W.2d 897.
In the case at bar, the proofs established that ratios were developed by the Wayne County Equalization Department using information concerning appraisal studies and the actions of local boards of review. Rather than undertaking appraisals, certain assumptions were made for large industrial properties, such as GLD, in arriving at ending ratios for the cities in the annual equalization *689 process. In its order to partially grant reconsideration upon remand from this Court, the Tax Tribunal adopted the ending ratios for the industrial class of real property in Ecorse and River Rouge as its average levels of assessment. Specifically, the Tax Tribunal adopted a ratio of fifty percent for each tax year, with three exceptions: 49.72% was adopted for tax years 1993 and 1994 in Ecorse, and 49.85% was adopted for 1991 in River Rouge.
With regard to tax year 1991 for the industrial real property in Ecorse, we hold that GLD has failed to establish that the Tax Tribunal adopted a wrong principle or committed an error of law in adopting the ratio of fifty percent because Thomas Monchak, the sole county employee who gave testimony relative to this issue, testified that the ratio would have been fifty percent even if GLD were separated from the other industrial property. The subject property need not be excluded when it is not a significant factor. Ford Motor Co, supra at 587-588, 234 N.W.2d 711. Because Ecorse's and GLD's attorneys stipulated that this same level of assessment would be applicable for tax year 1992, GLD has also failed to establish error with regard to tax year 1992.
However, with regard to tax year 1993, we hold that the Tax Tribunal committed an error of law in adopting the ending ratio of 49.72% because Ecorse failed to present substantial evidence that the ending ratio would have been the same even if GLD had been excluded by the county in arriving at the ending ratio. We reject Ecorse's contention on appeal that it was entitled to a ratio of fifty percent because Ecorse has failed to include citation to supporting authority. See Samonek, supra at 86, 527 N.W.2d 24. In passing, we observe that while it is apparent that some estimation and rounding is performed in determining the ratio, both the proofs and the Tax Tribunal's adoption of the ending ratio of 49.72% were based on the same level of precision sought by GLD on appeal. Therefore, we remand to the Tax Tribunal for a determination of a ratio of average level of assessment to true cash value under M.C.L. § 205.737; M.S.A. § 7.650(37), which excludes the industrial real property of GLD. Because the ratio of 49.72% adopted for tax year 1994 was derived from the study conducted for tax year 1993, the Tax Tribunal on remand shall also make a determination of the ratio for tax year 1994 that excludes the industrial real property of GLD.
With regard to the industrial real property for River Rouge, we note as a threshold matter that the record does not support River Rouge's claim that the Tax Tribunal adopted a ratio of fifty percent for each tax year. Further, we reject GLD's claim that it reached a stipulation with River Rouge for tax year 1992. The stipulation placed on the record was with Ecorse. Turning to the merits of GLD's argument, we hold that the Tax Tribunal committed an error of law in adopting the ending ratio of 49.85% for tax year 1991 and the ratios of fifty percent for tax years 1992 and 1993 because River Rouge failed to present substantial evidence that the ratio would have been the same, even if the GLD industrial real property had been excluded by the county in arriving at the ending ratios. Therefore, we remand to the Tax Tribunal for a determination of ratios, exclusive of the GLD industrial real properties, for tax years 1991, 1992, and 1993. The Tax Tribunal need not address tax year 1994 for River Rouge because GLD has not addressed this tax year in its brief on appeal. When a party fails to address the merits of an issue, it is deemed abandoned. Kent, supra at 210, 486 N.W.2d 110.

VII. TAX YEAR 1995
The final issue that we address concerns the Tax Tribunal's order that the assessment rolls for tax year 1995 be corrected to reflect the subject property's new 1995 taxable value as provided by M.C.L. § 211.27a(2)(a); M.S.A. § 7.27(1)(2)(a), as amended by 1994 P.A. 415, based upon the property's state equalization value as determined by the revised assessment for the 1994 tax year. We find that the jurisdictional question raised by River Rouge and Wayne County is dispositive of this issue.
The pertinent jurisdictional statute is M.C.L. § 205.735; M.S.A. § 7.650(35) of the Tax Tribunal Act. See Skybolt Partnership v. *690 Flint, 205 Mich.App. 597, 603, 517 N.W.2d 838 (1994). Under the statute, the Tax Tribunal's jurisdiction is invoked when a party in interest files a written petition on or before June 30 of the tax year involved. M.C.L. § 205.735(2); M.S.A. § 7.650(35)(2). The petition or answer may then be amended at any time by leave of the Tax Tribunal and in compliance with its rules. M.C.L. § 205.735(3); M.S.A. § 7.650(35)(3).
This jurisdiction statute should be distinguished from the Tax Tribunal's powers under M.C.L. § 205.732: M.S.A. § 7.650(32), which include, but are not limited to:
(a) Affirming, reversing, modifying, or remanding a final decision, finding, ruling, determination, or order of an agency.
(b) Ordering the payment or refund of taxes in a matter of which it may acquire jurisdiction.
(c) Granting other relief or issuing writs, orders, or directives which it deems necessary or appropriate in the process of disposition of a matter of which it may acquire jurisdiction.
(d) Promulgating ... rules for the implementation of this act.... [Emphasis added.]
On appeal, GLD relies on M.C.L. § 205.732(c); M.S.A. § 7.650(32)(c) as establishing the authority for the Tax Tribunal's actions relative to tax year 1995. We disagree.
The use of the word "may" in this statutory provision is to be given its ordinary and primarily accepted meaning and, in this sense, indicates that the granting of other relief is a permissive action. See Tobin v. Civil Service Comm., 416 Mich. 661, 667, 331 N.W.2d 184 (1982); Brenner v. Kolk, 226 Mich.App. 149, 155, 573 N.W.2d 65 (1997). However, it is a rule of statutory construction that an entire act must be read as a whole, and the interpretation to be given to a particular word in one section should be arrived at after due consideration of every other section so as to produce, if possible, an harmonious and consistent enactment as a whole. Weems v. Chrysler Corp., 448 Mich. 679, 699-700, 533 N.W.2d 287 (1995). A court must give the language a valid and reasonable construction that reconciles inconsistencies and gives effect to all the parts. Wright v. Vos Steel Co., 205 Mich.App. 679, 684, 517 N.W.2d 880 (1994).
Construed in this manner, the permissive language in M.C.L. § 205.732(c); M.S.A. § 7.650(32)(c) is not without limits. We first look to M.C.L. § 205.735; M.S.A. § 7.650(35) to determine if jurisdiction has been invoked for a particular assessment by the filing of a petition or an amendment thereto. This action is permissive because a party in interest plainly is not required to challenge an assessment. We then look to M.C.L. § 205.732; M.S.A. § 7.650(32) to determine the powers that the Tax Tribunal has with respect to the matter of which it has acquired jurisdiction.
In the case at bar, GLD's petitions pertained only to tax year 1991. Although the petitions were later amended to add tax years, there was no amendment for tax year 1995. Hence, the Tax Tribunal lacked jurisdiction to enter an order on how the taxable value for tax year 1995 should be computed, even though it appears that the Tax Tribunal was merely stating what M.C.L. § 211.27a; M.S.A. § 7.27(1) requires for tax year 1995. We therefore vacate the part of the Tax Tribunal's opinion applicable to tax year 1995.
In light of the above, we decline to address the due process argument raised by Wayne County and Ecorse. There exists a general presumption that constitutional issues that are not necessary to resolve a case will not be reached. Booth Newspapers, Inc. v. Univ. of Michigan Bd. of Regents, 444 Mich. 211, 234, 507 N.W.2d 422 (1993).

VIII. SUMMARY
In sum, we vacate the order for tax year 1995 on the basis of a lack of jurisdiction. We vacate the order pertaining to the other tax years for the steel-making facilities because the Tax Tribunal's determination of the overall true cash value of $483,078,750 was based on wrong principles or errors of law. The case is remanded to the Tax Tribunal for a determination of true cash value and assessed values consistent with this opinion. We express no opinion regarding the valuation approach that should be followed on *691 remand. However, in light of the small number of sales involving integrated steel mills, we instruct the Tax Tribunal to take a closer look at the components of the unadjusted sales prices, including their age and processes, in determining the most accurate method of valuation under the circumstances for each tax year. On remand, the Tax Tribunal shall also determine the levels of assessment for tax years 1993 and 1994 for Ecorse and tax years 1991, 1992, and 1993 for River Rouge, consistent with this opinion, for both steel-making and ancillary facilities. If necessary, the Tax Tribunal may reopen proofs to resolve these issues and to make legally supportable determinations. Cf. Jones & Laughlin Steel Corp., supra at 357, 483 N.W.2d 416.
Affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction. No taxable costs pursuant to MCR 7.219, no party having prevailed in full.
NOTES
[1] We note that the Tax Tribunal's concerns were consistent with the following observations in Clark Equipment Co., supra at 784, 318 N.W.2d 586:

The problem with valuing large industrial plants is a problem with the statutory standard itself. The reality is that these types of industrial plants are rarely bought and sold, so that a determination of "usual selling price" constitutes a metaphysical exercise which puts the Tax Tribunal in the position of having to resolve a question somewhat akin to how many angels can dance on the head of a pin.
[2] When addressing the valuation of commercial property by a township, Justice Levin observed:

Since the township's market estimates were derived by averaging the data from only two properties, their statistical value is practically nil. The township's witnesses could have arrived at the same result by averaging innumerable pairs of values. Also, the gross rent multiplier on these two "comparables" differed by approximately 22%, a discrepancy which would have amounted to a $284,000 per year difference in 1971-1974 assessments as calculated by the Tax Tribunal and a $360,000 difference in the 1975 assessments. These differences indicate that the "comparables" were not similar to each other and that a closer factual analysis should have been presented to show which, if either, was really comparable to the plaintiff's property. [CAF Investment Co. v. Saginaw Twp., 410 Mich. 428, 477, n. 13, 302 N.W.2d 164 (1981) (Levin, J., concurring).]
[3] M.C.L. § 24.271 et seq.; M.S.A. § 3.560(171) et seq.
[4] We do not consider the cities' claims that GLD was selling the coke oven pursuant to the wellsettled rule that an enlargement of the record on appeal is generally not permitted. Amorello v. Monsanto Corp., 186 Mich.App. 324, 330, 463 N.W.2d 487 (1990).
[5] In Meadowlanes Ltd. Dividend Housing Ass'n v. Holland, 156 Mich.App. 238, 243, 401 N.W.2d 620 (1986), the Court observed that it was appropriate for a tribunal judge to impose upon a taxing authority-respondent the burden of proof to at least establish that the original assessment was too low when that respondent is attempting to establish a cash value for property that differs from the original tax assessments. In the case at bar, we note that River Rouge attempted to establish new cash values for property located within River Rouge.
[6] Effective May 24, 1995, the exemption statutes were repealed by 1994 P.A. 451 and replaced by similar provisions in M.C.L. § 324.3704; M.S.A. § 13A.3704 (water), and M.C.L. § 324.5904; M.S.A. § 13A.5904 (air) of the Natural Resources and Environmental Protection Act.
[7] Effective January 30, 1996, M.C.L. § 207.564(1); M.S.A. § 7.800(14)(1), was amended by 1994 P.A. 1 to substitute "taxable value" for "state equalization valuation."
[8] Effective December 19, 1995, M.C.L. § 205.737(1); M.S.A. § 7.650(37)(1) was amended by 1995 P.A. 232 to specify that the Tax Tribunal determines taxable value.